IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RIVEREDGE DENTISTRY PARTNERSHIP, | ) | Case No. 1:22-cv-1007 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

Pending before the court are the parties' cross motions for summary judgment.  ECF Docs. 40, 49.  Additionally, the plaintiffs have moved to amend the caption of the complaint, ECF Doc. 57, and the defendant has filed an objection/motion to strike materials filed in support of the plaintiffs' motion for summary judgment, ECF Doc. 58.  The parties consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636, *et seq.*  ECF Doc. 4.  For the reasons that follow:

(i)    Defendant's objection/motion to strike (ECF Doc. 56) is DENIED IN PART and GRANTED IN PART;

(ii)    Plaintiffs' motion to amend (ECF Doc. 57) is GRANTED;

(iii)    Plaintiffs' motion for summary judgment (ECF Doc. 40) is DENIED;

(iv)    Defendants' motion for summary judgment (ECF Doc. 49) is GRANTED IN PART and DENIED IN PART;

(v)    Count Two is REMANDED to the Cuyahoga County Court of Common Pleas; and

(vi)     The remainder of the case is STAYED and administratively closed
         pending adjudication of Count Two in state court.

## I.     Background

This matter concerns repeated flooding and water damage in the basement of an office

condominium located at 3865 Rocky River Drive, Cleveland, Ohio, and was brought by the

following plaintiffs with varying property interests in that office condominium: Riveredge

Dentistry Ltd. Partnership ("Riveredge"); West Valley Condominium Association ("West

Valley"); the Darshana A. Shah Trust ("Shah Trust"); Dr. Benedict Kim ("Dr. Kim"); Kamm

Property LLC ("KP, LLC"); and Riveredge Dentistry, Inc. ("RDI") (collectively, "Plaintiffs").

ECF Doc. 14.  3865 Rocky River Drive is in the Kamm's Corners neighborhood of Cleveland,

Ohio, which is adjacent to and downgrade from a municipal parking lot owned and operated by

defendant City of Cleveland ("Cleveland") – the Kamms Municipal Parking Lot ("KMPL"). *Id.*

at 4-6.[1]  Plaintiffs contend that the repeated flooding of their property is the result of Cleveland

intentionally diverting stormwater into storm basins it designed and constructed in mid-2019,

with the construction financed pursuant to a grant by defendant Northeast Ohio Regional Sewer

District ("the District").  *Id.* at 6-17.

## II.    Facts[2]

### A.     General Facts concerning the Relevant Properties

Cleveland owns the KMPL and has operated an off-street municipal parking facility on

the property since 2000.  ECF Doc. 37 ¶¶ 1-2, 35.  This parking lot abuts the eastern boundary of

Plaintiffs' property at 3865 Rocky River Drive.  *Id.* ¶ 12; ECF Doc. 49-1 at 2; ECF Docs. 49-2,

49-3.  A two-story medical office building with a basement is located at 3865 Rocky River Drive

---

[1] Citations for all filings in the record will refer to the overall page number of each filing.
[2] The facts recited in this section are undisputed or established by Rule 56 evidence, unless otherwise
specified.

(the "Building").  ECF Doc. 37 ¶¶ 12, 30.  The Building is comprised of six condominium units, which are owned separately by varying plaintiffs – with two units in the basement, two units on the first floor, and two on the second floor.  *See* ECF Doc. 40-5 at 51; ECF Doc. 47-1 at 9, 16, 18; ECF Docs. 49-8, 49-9, 49-10, 49-11, 49-12, 49-13.

Cleveland initiated the planning and construction of a storm sewer culvert in 1925, known as the "Albers Sewer."  *Id.* ¶ 13; ECF Doc. 49-5.  The Albers Sewer is a 60" brick storm sewer that proceeds in a westerly direction along Albers Avenue, turns north and proceeds in a north-northwesterly direction along the boundary between 3865 Rocky River Drive and the KMPL before crossing through the northeast boundary of 3865 Rocky River Drive.  ECF Doc. 37 ¶¶ 13-14; ECF Doc. 49-5.  The Albers Sewer empties, discharges, and drains into the District's combined sewer system in Rocky River Drive.  ECF Doc. 37 ¶ 15.

### B.    Plaintiffs' Property Interests in the Building

West Valley was formed in October 1974 to establish a condominium form of ownership for the Building.  *See generally* ECF Doc. 49-7.  Riveredge owns three units in the Building, having purchased Unit 3A (a second-floor unit) on October 18, 1991, and Unit 1A and Unit 1B (two basement floor units) on August 19, 2004.[3]  ECF Doc. 47-1 at 18; ECF Docs. 49-8, 49-12; ECF Doc. 49-13 at 1; ECF Doc. 58-1 at 1.  Shah Trust owns one unit in the Building, with its trustee Darshana Shah having purchased Unit 2A (a first-floor unit) on December 10, 2019.  ECF Doc. 49-9; ECF Doc. 49-13 at 3.  Dr. Kim owns one unit in the Building, having purchased Unit 2B (a first-floor unit) on February 25, 2009.  ECF Doc. 49-10; ECF Doc. 49-13 at 5.  KP, LLC owns the final unit in the Building, having purchased Unit 3B (a second-floor unit) on September 13, 2016.  ECF Doc. 49-11; ECF Doc. 49-13 at 6.  All the plaintiffs, except West

---

[3] This fact is disputed by Cleveland.  But for reasons discussed in Section V.A below, the court finds that Riveredge Dentistry Partnership and Riveredge Dentistry Ltd. Partnership are the same entity.

Valley, possess a shared property interest in the common areas of the Building, with:
(i) Riveredge owning a 33.46% undivided interest; (ii) Shah Trust owning a 17.93% undivided
interest; (iii) Dr. Kim owning a 21.23% undivided interest; and (iv) KP, LLC owning a 27.38%
undivided interest.  *See* ECF Doc. 49-13 at 1; ECF Docs. 49-8, 49-9, 49-10, 49-11, 49-12, 49-13.
RDI is a lessee of Riveredge's second floor condominium unit (Unit 3A).  ECF Doc. 14 ¶ 10.

### C.    Stormwater and Flooding before the KMPL Improvements

The KMPL slopes downward from West 168th Street towards Rocky River Drive, with
the KMPL stormwater naturally draining from east to west towards the Building.  *See* ECF
Doc. 37 ¶¶ 18-19.  Given the slope of the parking lot, approximately 860,000 gallons of
stormwater naturally flow across the KMPL and towards the Building each year.  *See* ECF
Doc. 49-1 at 2.  For at least several decades prior to the completion of the KMPL improvements
in 2019, an 8-10" curb, which diverted stormwater into the Albers Sewer, was located along the
western boundary of the KMPL property line.  ECF Doc. 37 at ¶16-17; ECF Doc. 40-1, Ex. A
Waters's Aff. ¶¶ 13, 16;[4] *see* ECF Doc. 14-4.  Between 1991 and 2019, flooding had occurred in
the basement of the Building on at least two occasions.  ECF Doc. 40-1, Ex. A Waters's Aff. ¶ 8;
ECF Doc. 40-2 at 1.

### D.    Design and Construction of the KMPL Improvements

In December 2015, a local non-profit organization applied for a grant through the
District's Green Infrastructure Grant Program to repair the parking lot and address stormwater
flooding issues.  ECF Doc. 14-2 at 2; ECF Doc. 14-10 at 3.  The grant program was intended to
fund infrastructure projects that diverted water from the combined sewer system into
"stormwater source control measures that store, filter, infiltrate, harvest, and reuse or

---

[4] All exhibits filed under ECF Doc. 40-1 were manually filed with the court and cannot be accessed via CM/ECF.

evapotranspiration stormwater" (*i.e.*, rain gardens, bioretention basins, permeable pavement, etc.).  ECF Doc. 14-7 at 7, 13-14; *see also* ECF Doc. 14-10 at 2-3.  As part of the application process, the non-profit organization submitted a design for the construction of stormwater basins.  ECF Doc. 14-5 at 3, 7-9; ECF Doc. 14-7 at 19.

In January 2017, the District approved the non-profit organization's grant application, but Cleveland replaced the non-profit organization as the grant recipient because the non-profit organization lacked ownership and control of the parking lot.  ECF Doc. 14-5 at 3; ECF Doc. 14-10 at 3; ECF Doc. 49-1 at 2.  Cleveland subsequently submitted its own infrastructure improvement designs and construction plans for the parking lot, proposing: (i) the creation of large stormwater basins throughout the site to intercept stormwater runoff; and (ii) the placement of some of these basins along the property line abutting the Building.  *See* ECF Doc. 14-5 at 3; ECF Doc. 49-1 at 2-4.  Cleveland hired R.E. Warner to provide engineering services, including surveys, soil borings, and drainage calculations, and R.E. Warner hired a subcontractor who provided reports based on soil core samples and infiltration testing.  ECF Doc. 49-1 at 4; ECF Doc. 40-1, Pls.' Dep. Ex. 7.  After several rounds of review and modification before the District, the District approved Cleveland's design and construction plans.  *See* ECF Doc. 14-8; ECF Doc. 14-9; ECF Doc. 49-1 at 4-5.  Cleveland and the District entered into a grant program agreement setting forth the terms of its implementation.  ECF Doc. 14-10 at 2-10.  The KMPL stormwater basins were designed to discharge and/or drain stormwater into the ground with overflow discharging/draining into the Albers Sewer, with the overall KMPL improvements designed to facilitate the natural drainage of KMPL stormwater into these basins.  ECF Doc. 37 ¶¶ 5, 9.  Furthermore, the stormwater basins were designed to maximize the discharge of the KMPL stormwater into the ground.  *Id.* ¶ 34.

In February 2019, Cleveland hired Cook Paving and Construction ("Cook Paving") to construct the KMPL improvement, and construction commenced in May 2019.  ECF Doc. 37 ¶ 31; ECF Doc. 49-1 at 5; *see* ECF Doc. 40-1, Pls.' Dep. Ex. 7.  In May-June 2019, Cleveland completed construction of the KMPL improvements.  ECF Doc. 37 ¶ 33.  Cook built two of the storm basins along the western boundary of the KMPL pursuant to the plans, within ten feet of the Building.  *Id.*  ¶¶ 6, 28.  As constructed, these two storm basins discharge the KMPL stormwater into the ground within ten to twelve feet of the Building.  *Id.* ¶ 29.  The KMPL improvements, including the stormwater basins, divert stormwater away from the Albers Sewer; but after the ground surrounding the basins reaches maximum saturation, the Albers Sewer receives stormwater overflow from the basins.  *Id.* ¶¶ 20, 23-25.

### E.    Events Since Substantial Completion of the KMPL Improvements

On June 12, 2019, West Valley sent a letter to Cleveland stating that stormwater runoff from recent heavy rainfall was flooding the basement and first floor of the Building, which they attributed to design defects in the KMPL improvements.  ECF Doc. 49-14 at 1-2.  In June 2019, Cleveland observed that stormwater runoff from the KMPL was not flowing into the stormwater basins as intended, with too much water flowing into the basin nearest the Building, and it demanded that Cook Paving comply with plan specifications relating to the elevations and curb openings around two of the basins.  ECF Doc. 49-1 at 5-6; *see also* ECF Doc. 40-1, Pls.' Dep. Ex. 7.  In August of 2019, Cook Paving corrected the non-compliant work for the KMPL, and the KMPL improvements were ultimately constructed in accordance/compliance with Cleveland's plans and specifications.  ECF Doc. 37 ¶ 33; ECF Doc. 49-1 at 6.  In October of 2019, Cleveland installed other asphalt speed bumps to divert additional stormwater runoff to the basins as intended in the KMPL plans.  ECF Doc. 49-1 at 6.

Following the construction of the KMPL improvements, the basement of the Building has experienced persistent, intermittent flooding.  *See* ECF Doc. 40-1, Ex. A Waters's Aff. at 3-4; ECF Doc. 40-2; ECF Doc. 47-1 at 24; ECF Doc. 49-13.  Due to the repeated flooding events, the tenants of the basement units terminated their tenancies in late 2019 and Riveredge has been unable to rent those units to new tenants.  *See* ECF Doc. 40-1, Ex. A Waters's Aff. at 3-4; ECF Doc. 40-2.

### III.    Relevant Procedural History

#### A.    State Court Proceedings

On May 28, 2020, Riveredge, using the name Riveredge Dentistry Partnership,[5] filed a complaint in the Cuyahoga County Court of Common Pleas against the City of Cleveland and its contractor on the infrastructure project.[6]  ECF Doc. 1-2 at 2-9.  This was followed by two amended complaints which added the District as a defendant.  ECF Doc. 1-3 at 2-10; ECF Doc. 1-4 at 2-13.  The second amended complaint alleged that Cleveland and the District had recklessly and/or negligently diverted stormwater from Cleveland's and the District's sewer systems and onto Riveredge's property, causing flooding and property damage.  *See* ECF Doc. 1-4 at 4-12.  As relief, Riveredge sought damages and injunctive relief mandating that the KMPL stormwater basins be removed or altered to protect against further flooding.  ECF Doc. 1-4 at 12-13.

In November 2020, the District moved to dismiss the complaint as to itself.  ECF Doc. 1-6 at 5.  On January 11, 2021, the court granted the District's motion and dismissed Riveredge's negligence claim against the District with prejudice.  ECF Doc. 1-4 at 107.  The

---

[5] Riveredge Dentistry Partnership and Riveredge Dentistry Ltd. Partnership are the same entity.  *See* Section V.A.
[6] Cook Paving & Construction Company.  ECF Doc. 1-2 at 1-2.

court certified the decision under Ohio Civ. R. 54(B), and Riveredge filed a timely appeal to the

Ohio Court of Appeals.  ECF Doc. 1-4 at 108; ECF Doc. 1-6 at 4.  On October 28, 2021, the

Ohio Court of Appeals affirmed the trial court's dismissal of Riveredge's negligence claim

against the District.  ECF Doc. 14-12; *see also Riveredge Dentistry P'ship v. City of Cleveland*,

2021-Ohio-3817 (Ohio Ct. App. 2021).  The Ohio Court of Appeals determined that the District

was immune from liability for damages because the second amended complaint alleged harm

resulting from the inadequate design/construction of the stormwater basins, which was a

"governmental function" shielded from liability for damages, and not the maintenance,

operation, or upkeep of its combined sewer system, which would be a "proprietary function"

excepted from sovereign immunity.  *See* ECF Doc. 14-12 at 10-18.

On February 9, 2022, the Ohio Court of Appeals returned the case to the trial court

docket.  ECF Doc. 1-6 at 3.  On May 11, 2022, Riveredge filed a third amended complaint

against Cleveland and the District which: (i) reasserted the same factual allegations as the second

amended complaint, ECF Doc. 1-5 at 3-10; (ii) asserted negligence claims against Cleveland and

the District ("Negligence in [the] Operation of a Proprietary Function"), *id.* at 10-14; and

(iii) added a takings claim under both the United States Constitution and Ohio Constitution, *id.* at

15-16.  That takings claim alleged that the defendants' reckless and/or negligent diversion of

stormwater onto Riveredge's property constituted an unconstitutional taking because it violated

Riveredge's fundamental property rights and caused substantial property damage.  *Id.* at 15-16.

### B.    Federal Court Proceedings

On June 10, 2022, Cleveland filed a notice of removal, to which the District consented.

ECF Doc. 1.  On August 22, 2022, Riveredge, now using the name Riveredge Dentistry Ltd.

Partnership, filed a fourth amended complaint against Cleveland and the District.  ECF Doc. 14.

8

The fourth amended complaint added the remaining plaintiffs to this action: West Valley; Shah Trust; Dr. Kim; KP, LLC; and RDI.  *Id.* at 1, 4-5.  It asserted three causes of action: (i) a takings claim under the United States Constitution against Cleveland and the District, *id.* at 17-20; (ii) an inverse condemnation claim under the Ohio constitution against Cleveland and the District, *id.* at 21-22; and (iii) a negligence claim solely against Cleveland ("Negligent Diversion of KMPL Storm Waters"), *id.* at 22-25.  Factually, the fourth amended complaint added the assertion that Plaintiffs discovered cracks in the basement and along the eastern wall of the Building in 2021, during the pendency of Riverside's prior state court appeal.  ECF Doc. 14 at 3.  Plaintiffs alleged that engineers later advised them that the Building's eastern basement wall and floors were damaged and compromised by flooding from the stormwater basins, rendering the basement unusable.  *Id.* at 3, 14-15.

In September 2022, the District moved to dismiss the claims against it pursuant to Fed. R. Civ. P. 12(b)(6).  ECF Doc. 19; ECF Doc. 20.  The District argued that Ohio's doctrine of claim preclusion barred Plaintiffs from asserting their federal and state law takings claims against the District because: (i) the state trial court's prior dismissal of Riveredge's claim against the District was a final decision on the merits; (ii) the fourth amended complaint involved the same parties, given that the newly joined plaintiffs lack any interest in the matter in controversy apart from their shared ownership in the Building with Riveredge; (iii) the takings claims could have been raised in the second amended complaint as alternative claims for relief; and (iv) the takings claims arose out of the same transaction or occurrence – the design and/or approval of the specifications and construction of the stormwater basins.  ECF Doc. 20 at 7, 9-11; ECF Doc. 27 at 3-9.  On December 21, 2022, the court issued an order that granted the District's motion to dismiss (ECF Doc. 19) and dismissed the fourth amended complaint with respect to the claims

against the District, finding that the District had established all four elements for the application

of claim preclusion under Ohio law. ECF Doc. 28.

In relevant part, the court found that Riveredge could have raised a federal and state

takings claim in the second amended complaint, stating:

> Plaintiffs counter that the takings claim did not accrue until the structural damage from the flooding became apparent, which did not occur until after the second amended complaint was dismissed. ECF Doc. 25 at 7-8. However, this argument is belied by Riveredge's third amended complaint – which raised the takings claim for the first time – but did not allege any structural harm to the condominium. ECF Doc. 1-5 at 2-17. Moreover, Riveredge was not required to experience structural damage to the condominium basement before it could bring an Ohio takings claim. The recurrent flooding, which deprived Riveredge of the ability to rent the basement units, would have sufficed. *See State ex rel. Stamper v. City of Richmond Heights*, 2010-Ohio-3884, ¶30 (Ohio Ct. App. 2010) (finding that a complaint adequately alleged that a taking occurred based on allegations that the defendant approved a drainage for a private water sewer system that resulted in the plaintiff's property becoming a de facto public stormwater basin). That the interference with Riveredge's use and enjoyment of the condominium unit was not constant, but only interrupted during periods of rain, would not have precluded it from asserting an Ohio takings claim. Property subject to intermittent flooding is inherently less able to be rented. *See State ex rel. Gilbert v. City of Cincinnati*, 125 Ohio St.3d 385, 392 (Ohio 2010).
>
> Riveredge could also have raised a federal takings claim in conjunction with its [state] takings claim. *See, e.g.*, *Mitchell v. City of Mansfield*, 2021-Ohio-2421, ¶7 (Ohio Ct. App. 2021); *State ex rel. Rohrs v. Germann*, 2013-Ohio-2497, ¶17 (Ohio Ct. App. 2013); *see also Lumbard v. City of Ann Arbor*, 913 F.3d 585, 590 (6th Cir. 2019). The intermittent nature of the flooding would not, on its own, have precluded a federal takings claim. *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 38 (2012). It is enough that the flooding be inevitably recurring. *See Mays v. TVA*, 699 F. Supp. 2d 991, 1027 (E.D. Tenn. 2010). Thus, the third element for application of claim preclusion is satisfied.

*Id.* at 15-16.

Subsequently, the parties filed cross motions for summary judgment.[7] ECF Docs. 40, 49.

Relatedly, Plaintiffs also filed a motion to amend the caption of the complaint, ECF Doc. 57, and

Cleveland has filed an objection/motion to strike materials filed in support of Plaintiffs' motion

---

[7] The parties' arguments for and against dismissal are discussed in more detail in Section VII below.

for summary judgment, ECF Doc. 56.  With the filing of opposition and reply briefs for these respective motions, the matter is ripe for decision.  ECF Docs. 55, 58, 60, 61, 62, 64, 65.

## IV.    Cleveland's Objection/Motion to Strike

Before addressing the cross motions for summary judgment and the substantive arguments raised in the related briefing, the court will first address Cleveland's objection/motion to strike (ECF Doc. 56).  *See Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005) ("Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions.").  Cleveland requests that the court refuse to consider Exhibits C, D, and E to Plaintiffs' motion for summary judgment (ECF Docs. 40-3, 40-4, 40-5), pursuant to Fed. R. Civ. P. 56(b).  ECF Doc. 56 at 1-2.

As an initial matter, the court will treat Cleveland's objection/motion to strike solely as objections under Rule 56(c)(2).  "[A] motion to strike is not the proper vehicle for attacking exhibits filed in support of, or in opposition to, motions for summary judgment." *Stephenson v. Family Sols. of Ohio, Inc.*, No. 1:18cv2017, 2021 U.S. Dist. LEXIS 38754, at *12 (N.D. Ohio Mar. 2, 2021) (collecting cases).  Rather, Rule 56(c)(2) is the proper avenue of review in this instance, as it governs objections to the admissibility of evidence offered to support a factual assertion in a motion for summary judgment.  *See* Fed. R. Civ. P. 56(c)(2); *see also* Fed. R. Civ. P. 56(c) (2010 Advisory Committee Notes) (explaining that an objection under Rule 56(c)(2) "functions much as an objection for trial, adjusted for the pretrial setting. . . . There is no need to make a separate motion to strike.").  Under Rule 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  After such an objection, the burden is placed on the proponent of the supporting material to demonstrate that the material is admissible as presented

or explain how it could be presented in a form that would be admissible.  *Mangum v. Repp*, 674 F. App'x 531, 536-37 (6th Cir. 2017) (citing Fed. R. Civ. P. 56(c) (2010 Advisory Committee Notes)).

On summary judgment, the central inquiry "determin[es] whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Generally, a district court "will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter."  *Kermavner v. Wyla, Inc.*, 250 F. Supp. 3d 325, 329 (N.D. Ohio 2017) (citing *Anderson*, 477 U.S. at 249).  A district court examines only "disputes over facts that might affect the outcome of the suit under governing law."  *Anderson*, 477 U.S. at 248.  "[I]t is well settled that only admissible evidence may be considered by the trial court ruling on a motion for summary judgment."  *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  As relevant here, "hearsay evidence cannot be considered on a motion for summary judgment."  *Wiley*, 20 F.3d at 225-26; *see also* Fed. R. Civ. P. 56(c)(4) (relating to affidavits).  Rule 56(e) "requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify."  *Wiley*, 20 F.3d at 225-26.

### A.    Objection to the Expert Reports

Cleveland contends that the court cannot consider Exhibit D (ECF Doc. 40-4), the expert report of Christopher Jasinski (the "Jasinski Report"), and Exhibit E (ECF Doc. 40-5), the expert report of Dwight Kumler (the "Kumler Report"), because they are hearsay and therefore cannot be considered at the summary judgment phase.  ECF Doc. 56 at 4-5.  Cleveland asserts that

Plaintiffs did not allow these experts to be deposed, which rendered their corresponding expert reports inadmissible.  *Id.*

Plaintiffs respond that Cleveland was timely provided with the expert reports, as well as résumés and credentials of the experts, and it had ample opportunity to depose Plaintiffs' experts (Jasinski, Kumler, and William C. Vondra, Jr.), before the discovery cutoff but it never issued any notices of deposition.  ECF Doc. 61 at 1-3.  Addressing the lack of attestation, Plaintiffs argue that: (i) the expert reports were filed under the authority of the experts' Ohio business licenses; and (ii) to the extent that attestation or verification is necessary, Plaintiffs have attached nunc pro tunc attestations (ECF Docs. 61-1, 61-2) that do not prejudice Cleveland.  *Id.* at 1-2.

Cleveland replies that: (i) the stamps contained on the expert reports do not render the reports admissible declarations because they do not comply with the requirements under 28 U.S.C. § 1746(2); (ii) the nunc pro tunc declarations do not cure the any deficiencies because they provide no substance, they themselves are hearsay, and the experts were never subject to cross examination; and (iii) Kumler's nunc pro tunc declaration does not establish a proper foundation for Kumler's opinion under Fed. R. Evid. 702.  *See* ECF Doc. 65 at 1-3.

The Sixth Circuit has held that unsworn expert reports are hearsay evidence that may not be considered to decide a summary judgment motion.  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 480-81, 488 (6th Cir. 2008).  However, Plaintiffs attached the sworn declarations of Kumler and Jasinski, wherein they attested to the accuracy and contents of their expert reports under the threat of perjury.  ECF Docs. 61-1, 61-2.  These declarations cure any technical deficiencies associated with the submission of the original, unsworn reports.  *See Hope v. Hewlett-Packard Co.*, No. 14-11497, 2016 U.S. Dist. LEXIS 26878, at *8 (E.D. Mich. Mar. 3, 2016) (citing *Harnden v. Jayco, Inc.*, 496 F.3d 579, 583 (6th Cir. 2007)); *In re Iron Workers Local 25 Pension*

*Fund*, No. 04-cv-40243, 2011 U.S. Dist. LEXIS 34505, at *32-33 (E.D. Mich. Mar. 31, 2011);

*Mills v. Cnty. of Lapeer*, No. 2:09-cv-14026-PDB-MAR, 2011 U.S. Dist. LEXIS 16030, at *3-5

n.2 (E.D. Mich. Feb. 17, 2011); *see also Mueller v. Chugach Fed. Sols., Inc.*, Civil Action No.

12-S-00624-NE, 2014 U.S. Dist. LEXIS 86283, at *39 (N.D. Ala. June 25, 2014) ("Consistent

with that rule, a 'number of district courts have permitted affidavits to cure previously unsworn

materials.'" (quoting Fed. R. Civ. P. 56(e)(1)) (collecting cases); *Ibanez v. Univ.-Kingsville*, No.

2:21-CV-00249, 2023 U.S. Dist. LEXIS 181287, at *5 (S.D. Tex. Aug. 29, 2023) ("However, the

deficiency posed by an unsworn expert report may be cured if the expert files a sworn

declaration."); Wright & Miller, Affidavits in Support of or in Opposition to Summary

Judgment, 10B Fed. Prac. & Proc. Civ., § 2738 (4th ed. July, 2020) ("Subsequent verification or

reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to

consider the unsworn expert's report on a motion for summary judgment.").

Cleveland has not objected to or challenged the authenticity of the reports, the

information provided in them, or the expertise and credentials of the experts themselves. *See*

ECF Docs. 56, 65. Considering the record evidence, and the lack of objection, it appears that

both Kumler and Jasinski are competent to give their opinions, and the contents of their reports

(their opinions), will be admissible through their testimony at trial. *See* Fed. R. Evid. 802. There

is no indication, nor has Cleveland suggested, that Jasinski and Kumler will be unavailable to

testify at trial (where they would be subject to cross-examination), and thus, the opinions of

Jasinski and Kumler are generally admissible for purposes of summary judgment. Moreover,

Cleveland concedes that it was aware of the contents of the experts reports well before the cross

motions for summary judgment were filed. Accordingly, Cleveland will not be prejudiced if the

court considers the Jasinski Report and Kumler Report.  Cleveland's objections as to Exhibits D and E (ECF Docs. 40-4, 40-5) are DENIED.

> **B.**     **Objections to Vondra's Affidavit**

Cleveland contends that the court cannot consider Exhibit C (ECF Doc. 40-3), the affidavit of William C. Vondra, Jr., because: (i) Vondra stated conclusory opinions concerning ultimate legal issues; (ii) the affidavit does not provide supporting facts for these conclusory opinions; and (iii) nothing in the affidavit or record demonstrates that Vondra's opinions will be helpful to the trier of fact or that they were the product of reliable methods and principles.  ECF Doc. 56 at 5-6.  Plaintiffs respond that: (i) Cleveland never challenged Vondra's qualifications; (ii) Vondra was not stating a legal conclusion by using the terms "reckless" and "negligent"; and (iii) Vondra is clearly qualified to identify engineering failures in the design of the KMPL project and to recognize deviations from engineering best practices and procedures.  *Id.* at 3-4.

Federal Rule of Civil Procedure 56 requires that an affidavit used to support or oppose a summary judgment motion must: (i) be made on personal knowledge; (ii) set out facts that would be admissible in evidence; and (iii) show that the affiant or declarant is competent to testify on the matters stated.  Fed. R. Civ. P. 56(c)(4).  An expert opinion must also comply with Federal Rule of Evidence 702, which states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reasonably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In the context of summary judgment, the Sixth Circuit has held that an expert opinion "must be more than a conclusory assertion about ultimate legal issues."  *Brainard v. Am.*

*Skandia Life Assurance Corp.*, 432 F.3d 655, 663-64 (6th Cir. 2005) (internal quotations omitted).  "Moreover, an expert opinion 'must set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." *Id.* (citations omitted).  In other words, "[e]xpert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (internal quotation marks and citations omitted).

Under Federal Rule of Evidence 704(a), an expert's opinion in a civil case "is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a).  However, the issue must be a factual one and expert testimony expressing a legal conclusion must be excluded. *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (citing Fed. R. Evid 704(a)). Additionally, expert testimony that "does little more than tell the jury what result to reach--is properly excludable under the Rules." *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir.1997); *see also Black v. Ryder/P.I.E. Nationwide, Inc.*, 930 F.2d 505, 510 (6th Cir. 1991) ("The district court [is] still free . . . to exclude opinion testimony that the court concluded would not be helpful to its factfinding mission."); *Artuso v. Felt*, No. 1:19-cv-01798, 2022 U.S. Dist. LEXIS 232087, at *24-25 (N.D. Ohio Dec. 27, 2022) (citing Fed. R. Evid. 704 (1972 Advisory Committee Notes)).

Here, Vondra's affidavit provided a large list of conclusions concerning the design and construction of the KMPL improvements, as well as the results caused by the construction and the foreseeability of those outcomes.  *See* ECF Doc. 40-3.  However, the affidavit does not provide a sufficient line of reasoning as to how and why Vondra reached these conclusions – with Vonda generally stating that he reviewed the various evidence in the record and then reciting his conclusions without further explanation.  For example, several times Vondra stated

16

that Cleveland failed to follow "standard and/or best engineering practice."  But he never provided or explained what these standards and best practices are or where they come from.  *See id.* at 3-4.  Vondra's affidavit did not provide a logical bridge between the evidence he reviewed and his opinion, leaving the court and any other trier of fact in the dark as to how or why he arrived at his conclusions.  Vondra's affidavit is also deficient because it provided a fair number of legal conclusions that should be ultimately left to the trier of fact: namely, whether the design and implementation of the sewer basins was negligent or reckless.  *See id.* at 3-5.  In this instance, Plaintiffs have not met their burden of demonstrating that Vondra's affidavit is admissible as presented or explaining how it could be presented in an admissible form at trial.  *Mangum*, 674 F. App'x at 536-37.

"The decision to admit or exclude such evidence ultimately turns on whether it is helpful to the trier of fact."  *Heflin v. Stewart Cnty., Tenn.*, 958 F.2d 709, 715 (6th Cir. 1992) (internal quotation marks omitted) (quoting *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985)).  In this instance, given the affidavit's deficiencies, the court finds that it would be not only inappropriate for the trier of act to consider, but ultimately unhelpful.  Accordingly, Cleveland's objections as to Exhibit C (ECF Doc. 40-3) are SUSTAINED, and the court will not consider the affidavit when resolving the parties' cross motions for summary judgment.

## V.     Summary Judgment Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018).  The moving party must demonstrate "the basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotation omitted).  The nonmoving party may not simply rely on her pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted); *see also Betkerur v. Aultman Hospital Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996) (providing that a trial court does not have the responsibility to search the record *sua sponte* for genuine issues of fact).  A reviewing court must determine whether the evidence that the nonmoving party relies upon "presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.  In evaluating the evidence presented on a summary judgment motion, courts must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255.  Nevertheless, a court need not accept as true any unsupported or conclusory statements.  *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment.").

Cross motions for summary judgment do not change the court's standard for evaluation. *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (citing *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).  Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538-39 (5th Cir. 2004); *see also Stansbury v. Faulkner*, 443 F. Supp. 3d 918, 924 (W.D. Tenn. 2020) ("Although the parties in this case have filed cross-motions for summary judgment, the legal standard remains the same, and each motion will be considered separately.").

18

**VI.    The Parties' Cross Motions for Summary Judgment**

In their motion for summary judgment, Plaintiffs move for judgment in their favor on their federal takings claim (Count One) and state takings claim (Count Two).  ECF Doc. 40 at 13-22.  Cleveland moves for summary judgment in its favor on all three claims in this action – both takings claims (Counts One and Two) and the trespass/negligent diversion claim (Count Three).  ECF Doc. 49 at 18-39.  Although Plaintiffs' motion focuses entirely on the merits of their takings claims, *see* ECF Doc. 40 at 13-22, Cleveland's motion raises additional arguments concerning: (i) whether Riveredge Dentistry Ltd. Partnership and Riveredge Dentistry Partnership are separate entities, ECF Doc. 49 at 22-23; (ii) whether the statute of limitations bars Plaintiffs' federal takings claims, *id.* at 18-24; and (iii) whether any of the plaintiffs have standing to assert a federal or state takings claim, *id.* at 25-27.

Given these "non-merits" arguments raised by Cleveland, the court will first address the matter of Riveredge's identity and Plaintiffs' standing before addressing the merits of Counts One, Two, and Three.

**A.    Whether There are Two, Separate "Riveredge Partnerships"**

Cleveland contends that Riveredge Dentistry Ltd. Partnership and Riveredge Dentistry Partnership are separate entities with different title interests in the Building.  ECF Doc. 49 at 23.  Cleveland appears to reference William Waters's April 2022 sworn affidavit, wherein he attests that:

> 5.    The Riveredge Dentistry Partnership is a Member of the Association and holds a 16.2% interest in the above identified real estate, specifically, PPN -25-25-301-02;

> * * *

19

8.      Riveredge Dentistry Limited Partnership is a Member of the Association holds a 17.26% interest in the above identified real estate, specifically PPN 025-25-305; . . . .

ECF Doc. 49-13 at 1.  At first glance, these assertions seem to indicate that Riveredge Dentistry Partnership and Riveredge Dentistry Limited Partnership are separate entities that own different units in the Building and different percentage shares of the common areas.

In opposition, Plaintiffs argue that Riveredge Dentistry Partnership and Riveredge Dentistry Limited Partnership are the same entity.  ECF Doc. 58 at 6.  They also provided supplemental sworn affidavits by William Waters and CPA James Wise.  ECF Docs. 58-1, 58-2.  In his supplemental affidavit, William Waters, in relevant part, attests that: (i) he is the "general and managing partner for Riveredge Dentistry Ltd. Partnership dba Riveredge Dentistry Partnership and/or Riveredge Dentistry Ltd. Partnership;" (ii) Riveredge Dentistry Partnership and Riveredge Dentistry Ltd. Partnership are the same entity; and (iii) Riveredge Dentistry Ltd. Partnership owns three condominium units at the Building (two in the basement and one on the second floor).  ECF Doc. 58-1 at 1-2.  In his sworn affidavit, CPA James Wise attests that he: (i) has filed tax returns for Riveredge Dentistry Partnership for the past 17 years; (ii) is unaware of any separate Riveredge Dentistry Partnership, other than Riveredge Dentistry Ltd. Partnership; (iii) there is a "single tax id issued to Riveredge Dentistry Partnership, an Ohio limited partnership;" and (iv) has filed tax returns for only one entity – Riveredge Dentistry Limited Partnership.  ECF Doc. 58-2.

On December 5, 2023, the court held oral argument, in part, on the issue of whether Riveredge Dentistry Ltd. Partnership and Riveredge Dentistry Partnership are separate entities.  *See* Doc. 66; dkt. entry dated Dec. 5, 2023.  At oral argument, Plaintiffs explained that Waters listed different percentages of ownership in his April 2022 affidavit in an attempt to reflect that

the relevant title documents name: (i) "Riveredge Dentistry Partnership" as the owner of the two basement units in the Building (Unit 1A - PPN 025-25-301 and Unit 1B – PPN 025-25-302), *see* ECF Doc. 49-12; and (ii) "Riveredge Dentistry, an Ohio limited partnership" as the owner of the second floor unit at the Building (Unit 3A - PPN 025-24-305), *see* ECF Doc. 49-8.

After reviewing the record and taking the parties' arguments under advisement, the court finds that Riveredge Dentistry Ltd. Partnership and Riveredge Dentistry Partnership are the same entity.  Cleveland has not provided caselaw or furnished further evidence which establishes that Riveredge Dentistry Ltd. Partnership and Riveredge Dentistry Partnership are separate entities or should be treated as such, with no demonstration that: (i) Riveredge has held itself out or acted as two separate entities; and (ii) in the absence of such behavior, the use of slightly different names on the pleadings or on relevant deeds created *de facto* separate entities.

### B.    Plaintiffs' Standing

Cleveland argues that Plaintiffs lack standing to pursue a federal or state law takings claim because they each lack a sufficient estate or interest in the property allegedly taken – the basement units at the Building.  *See* ECF Doc. 49 at 25-27.  Specifically, Cleveland argues that: (i) RDI, as a lessee, lacks any title or legal interest in any units at the Building; (ii) West Valley does not own any unit and lacks standing to bring a takings action as a condominium association; and (iii) the other plaintiffs, Riveredge, Shah Trust, Dr. Kim, and KP, LLC, have no legal interest or title in the basement units at the Building.  *Id.*

Article III standing requires a plaintiff to show, among other things, an "injury in fact" that is both: (1) "concrete and particularized;" and (2) "actual or imminent, not conjectural or hypothetical."  *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  To establish an Article III injury,

21

"plaintiffs must allege the 'invasion of a legally protected interest.'"  *See CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 485 (6th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 300, 339 (2016))  The Sixth Circuit has held that "once the plaintiff has alleged a 'colorable' or 'arguable' claim that the defendant has invaded a legally protected interest, the plaintiff has met this element of an Article III injury."  *See id.* at 489 (citations omitted).

First, Cleveland's standing argument is unpersuasive as to Riveredge because, as discussed above, Riveredge is a single entity and therefore it owns the two basement condominium units relevant to this action.  *See* ECF Doc. 47-1 at 18; ECF Docs. 49-8, 49-12; ECF Doc. 49-13 at 1; ECF Doc. 58-1 at 1.  Second, the court finds the West Valley has standing to assert a takings/inverse condemnation claim.  Under Ohio Rev. Code § 5311.20, a condominium owner's association has authority to sue as a separate legal entity in any action relating to the "common elements."  Ohio Rev. Code § 5311.20.  In relevant part, "common elements" are defined as "[a]ll other areas, facilities, places, and structures that are not part of a unit," which includes: "(a) Foundations, columns, girders, beams, supports, supporting walls, roofs, halls, corridors, lobbies, stairs, stairways, fire escapes, entrances, and exits of buildings; [and] (b) Basements, yards, gardens, parking areas, garages, and storage spaces; . . ."  Ohio Rev. Code § 5311.01(F).  "Further, 'pursuant to R.C. 5311.20, the unit owners association, on behalf of all unit owners and for each of them, is the proper party to bring an action for damages pertaining to the common areas sustained by any or all of the unit owners.'"  *Vill. Condos. Owners Ass'n v. Montgomery Cnty. Bd. of Revision*, 2005-Ohio-4631, ¶ 16, 106 Ohio St. 3d 223, 227, 833 N.E.2d 1230, 1234 (Ohio 2005) (quoting *Stony Ridge Hill Condo. Owners Ass'n v. Auerbach*, 64 Ohio App.2d 40, 410 N.E.2d 782 (Ohio. Ct. App.  1979)).

Although there is no caselaw in which Ohio courts have addressed whether a condominium owners association has standing in the context of an inverse condemnation claim, Ohio courts have held a condominium association has standing in other civil cases involving claims of damages relating to the common elements of a condominium. *See, e.g.*, *Point E. Condo. Ass'n. v. Cuyahoga Cnty. Bd. of Revision*, Nos. 73083, 73084, 1998 Ohio App. LEXIS 3156, at *8-9 (Ohio Ct. App. July 9, 1998); *Point E. Condo. Owners' Ass'n v. Cedar House Assocs. Co.*, 104 Ohio App. 3d 704, 710, 663 N.E.2d 343, 347-48 (Ohio Ct. App. 1995); *Stony Ridge Hill*, 410 N.E.2d at 785-86. And Plaintiffs' claims here include allegation concerning the common elements of the Building, with flooding alleged to have caused damages to common areas of the Building's basement, foundation, and structural elements – *i.e.*, "common elements." *See* ECF Doc. 14 at 14-16, 19, 23; ECF Doc. 40-4 at 10-34. Thus, West Valley, at a minimum, has standing to assert a state law takings claim.[8]

Based on the above discussion, the court finds that Shah Trust, Dr. Kim, and KP, LLC, all have standing to assert takings claims because they each own a shared interest in the Building's common areas, including its basement and foundation. *See* ECF Doc. 49-9; ECF Doc. 49-10; ECF Doc. 49-11; ECF Doc. 49-13 at 1, 3, 5-6. Finally, the court finds that RDI lacks standing to assert a takings claim. Based on the pleadings, RDI is a lessee of Riveredge's second floor unit – Unit 3A. ECF Doc. 14 ¶ 10; *see* ECF Docs. 49-8; ECF Doc. 49-13 at 1.

---

[8] Because the court has dismissed Count One as to West Valley below based on the statute of limitations, the court does not need to specifically determine whether West Valley has standing to assert a federal takings claim in this case. However, the court notes that West Valley might have "associational standing." In the absence of direct injury, an organization may establish "associational standing" if it can demonstrate that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710, 717 (6th Cir. 1995) (quoting *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977) (internal quotation marks omitted).

Plaintiffs have provided no evidence or otherwise asserted that RDI has any estate or property interest in the Building's basement units or its common elements.  *See* ECF Docs. 49-13, 58-1. Plaintiffs have made no allegation, or presented evidence, that flooding in this case caused RDI to lose profits related to its lease or that RDI otherwise suffered an injury separate and distinct from the other plaintiffs in this action.  As such, Plaintiffs have not asserted a colorable claim that RDI has suffered the invasion of a protected interest.  Accordingly, RDI lacks standing to assert a takings claim and the court will DISMISS Counts One and Two as to RDI.

## B.    Count Three – Trespass/Negligent Diversion of Stormwater

The Sixth Circuit has recognized that, "[w]hen a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited." *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 325 (6th Cir. 2023); *see Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[Sixth Circuit] jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") (collecting cases).  When a party has abandoned, waived, or forfeited a claim by failing to support or address it in a response to a motion for summary judgment, district courts in the Sixth Circuit have granted summary judgment as a matter of course.  *See Alexander v. Carter*, 733 F. App'x 256, 261 (6th Cir. 2018); *Alexander v. Byrd*, No. 14-1022-STA-egb, 2017 U.S. Dist. LEXIS 95310, at *14-15 (W.D. Tenn. June 21, 2017) (collecting cases).

Plaintiffs' motion for summary judgment did not address Count Three.  *See* ECF Doc. 40. In its motion for summary judgment, Cleveland argues that summary judgment should be entered in its favor on Count Three because: (i) the statute of limitations bars the claim for all plaintiffs; and (ii) Cleveland is entitled to immunity under Ohio's Political Subdivision Liability Act, Ohio

24

Rev. Code § 2744.01, *et seq.*  ECF Doc. 49 at 24-29.  As noted by Cleveland, Plaintiffs' motion for summary judgment appears to concede that Count Three is barred by Ohio's Political Subdivision Liability Act.  *See* ECF Doc. 40 at 12 n.14.  Moreover, Plaintiffs have not addressed Cleveland's arguments for the dismissal of Count Three, nor have they otherwise referenced or discussed Count Three in any fashion in their opposition brief to Cleveland's motion for summary judgment or in any other summary judgment related briefing.  *See generally* ECF Docs. 40, 58, 63.

Because Plaintiffs have failed to address or respond to Cleveland's arguments regarding Count Three, or otherwise address that count at all, the court finds that Plaintiffs have abandoned Count Three.  Accordingly, the court will GRANT summary judgment in favor of Cleveland on Count Three.

### C.    Count One – Federal Takings Claim

#### 1.    Statute of Limitations

Cleveland argues that the statute of limitations bars Plaintiffs' federal takings claims because: (i) it is a two-year statute of limitations; (ii) the takings claims accrued no later than June 12, 2019; (iii) the continuing violation doctrine does not apply; and (iv) Plaintiffs did not file their takings claims before the statute of limitations lapsed on June 12, 2021.  ECF Doc. 49 at 18-22.  Cleveland further argues that Plaintiffs takings claims do not relate back to the original complaint, or any pleadings filed before June 2021 because they are all new entities.  *Id.* at 22-24.  Plaintiffs respond that their federal takings claim is timely because: (i) the statute of limitations is four years; (ii) the takings claims accrued no earlier than December 2022; (iii) the continuing violation doctrine applies to toll the statute of limitations; and (iv) Plaintiffs' claims all relate back to the original complaint under Rule 15.  ECF Doc. 58 at 9-15.

25

Thus, to resolve whether the statute of limitations has expired and bars Plaintiffs' federal taking claims, the court must determine: (i) whether the statute of limitations is two or four years; (ii) when Plaintiffs' federal takings claims accrued; (iii) whether the statute of limitations has been tolled due to the continuing violation doctrine; and (iv) if the statute of limitations lapsed, whether Plaintiffs' claims relate back to before the lapse.

### a.  Length of the Statute of Limitations

Count One alleges a takings claim under 42 U.S.C. § 1983.  "The statute of limitations for § 1983 claims is the relevant state's statute of limitations for personal-injury torts."  *Beaver St. Invs., LLC v. Summit Cnty.*, 65 F.4th 822, 826 (6th Cir. 2023) (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)); *see also Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007) ("The Supreme Court has held that § 1983 claims are best characterized as tort actions for the recovery of damages for personal injury and that federal courts must borrow the statute of limitations governing personal injury actions from the state where the § 1983 action was brought.").  In Ohio, the statute of limitations for filing a personal injury action is two years pursuant to Ohio Rev. Code Ann. § 2305.10.  *Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989).  Thus, a two-year statute of limitations applies to all § 1983 claims in Ohio.  *See Beaver St. Invs.*,65 F.4th at 826; *Browning*, 869 F.2d at 992.

Plaintiffs argue that their federal takings claims are subject to a four-year statute of limitations, citing *McNamara v. City of Rittman*.[9]  ECF Doc. 58 at 9-11 ("In *McNamara*, the Sixth Circuit clearly stated that the four-year limitations period in Ohio Rev. Code §2305.09(E) should apply to takings claims brought after 2004[.]").  But the *McNamara* court's statement that a four-year statute of limitations should apply to federal takings claims in Ohio was merely dicta

---

[9] 473 F.3d 633 (6th Cir. 2007).

and had no bearing on the Sixth Circuit's disposition of the case because: (i) the parties in that case agreed that the applicable statute of limitations was two years; and (ii) the action was filed six years after the claim accrued and would have been barred under either statute.  *See McNamara*, 473 F.3d at 637.  After *McNamara*, courts within the Sixth Circuit have continually applied a two-year statute of limitations for § 1983 claims.  *See, e.g.*, *Beaver St. Invs.*,65 F.4th at 826; *Campbell v. Smith*, No. 21-4198, 2022 U.S. App. LEXIS 25002, at *3-4 (6th Cir. Sep. 6, 2022); *3799 Mill Run Partners, LLC v. City of Hilliard, Ohio*, 839 F. App'x 948, 950 (6th Cir. 2020); *Basista Holdings, LLC v. Ellsworth Twp.*, 710 F. App'x 688, 691 (6th Cir. 2017); *Guba v. Huron Cnty.*, 600 F. App'x 374, 379 (6th Cir. 2015).  Moreover, this Court has previously rejected Plaintiffs' four-year statute of limitations argument when it was raised in a similar case:

> In opposition, plaintiffs assert that the four-year statute of limitations in Ohio Rev. Code § 2305.09 "applie[s] to takings claims under Ohio law[.]"  (Pl.Opp'n at 466, citing *McNamara v. City of Rittman*, 473 F.3d 633, 637 n.1 (6th Cir. 2007).  But § 1983 claims are not taking claims; they are personal injury claims.  *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003) ("section 1983 claims [are] best characterized as tort actions for the recovery of damages for personal injuries and federal courts must borrow the statute of limitations governing personal injury actions in the state in which the section 1983 action was brought.") (citing *Wilson*, 471 U.S. at 275-76; *Owens v. Okure*, 488 U.S. 235, 109 S. Ct. 573, 102 L.Ed. 2d 594 (1989); *Browning v. Pendleton*, 869 F.2d 989 (6th Cir. 1989)).  In *Banks*, the court of appeals noted that it has "squarely rejected attempts to get around" the two-year statute of limitations.  *Id.* (citing *LRL Props. v. Portage Metro Housing Auth.*, 55 F.3d 1097, 1105 (6th Cir. 1995) (rejecting application of Ohio Rev. Code § 2305.09); *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 519-20 (6th Cir. 1997) (same)).
>
> Accordingly, a two-year statute of limitations applies . . . .

*Woods Cove, III, LLC v. City of Akron*, No. 5:16-CV-1016, 2018 U.S. Dist. LEXIS 147234, at *19-21 (N.D. Ohio Aug. 29, 2018) (alterations in original).  Following this well-established precedent, the court finds that the applicable statute of limitations for Plaintiffs' federal takings claim under Count Two is two years.

b.      Date of Accrual

Cleveland argues that Plaintiffs' federal takings claims accrued "by May of 2019, and no later than June 12, 2019" because Plaintiffs had reason to know their claims were ripe; with Cleveland citing: (i) the completion of the KMPL improvements in May 2019; (ii) testimony by Riveredge's partner that flooding started in early June 2019; and (iii) a June 12, 2019 letter by Plaintiffs' counsel alleging that the flooding was due to the KMPL improvements.  ECF Doc. 49 at 19-21.  Plaintiffs contend that their claims accrued no earlier than December 2022 because they had no reason to know they had suffered a "constitutional injury" until Jasinski issued his report that the stormwater had structurally damaged the Building.  ECF Doc. 58 at 12.

The statute of limitations for § 1983 claims begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action."  *Beaver St. Invs.*, 65 F.4th at 826 (citing *Wallace*, 549 U.S. at 387; and quoting *Kuhnle Brothers, Inc. v. Cnty. of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997)); *see also Ruff v. Runyon*, 258 F.3d 498, 500 (6th Cir. 2001); *Ideker Farms, Inc. v. United States*, 71 F.4th 964, 975 (Fed. Cir. 2023) ("A claim accrues 'when all the events have occurred which fix the liability of the Government' and the plaintiff 'was or should have been aware' that the claim existed.").

Takings claims based on intermittent flooding present unique difficulties for determining the precise time of accrual, because a claim cannot be said to have accrued upon the first instance of flooding; rather, it must be determined when persistent, intermittent flooding constitutes a taking by the government.  In *Lenoir v. Porters Creek Watershed Dist.*, the Sixth Circuit explained that a federal takings claim was viable in instances of intermittent flooding but only when the intermittent flooding was proven to be inevitably recurring.  586 F.2d 1081, 1094 (6th Cir. 1978) ("Government-induced flooding not proved to be inevitably recurring occupies the

28

category of mere consequential injury, or tort. In such cases recovery is not authorized in this court."). Similarly, the Federal Circuit has "rejected the argument that a 'takings claim accrued immediately upon the first inundation of the property because at that point, the frequency and permanency of the flooding were still undeterminable.'" *Ideker Farms*, 71 F.4th at 975-76 (quoting *Mildenberger v. United States*, 643 F.3d 938, 945 (Fed. Cir. 2011)). Thus, in cases of intermittent flooding, a plaintiff would have sufficient reason to know that a takings claim had occurred (*i.e.*, a takings claim was ripe) when one could reasonably conclude that the flooding at issue was inevitably recurring.

In making such a determination, courts in the Federal Circuit have adopted a "stabilization approach," in which a plaintiff's takings claim is deemed to have accrued "after it first became clearly apparent by the passage of time that the intermittent flooding was of a permanent nature" or "of a sufficiently recurring nature." *Robertson v. United States*, No. 17-60L, 2023 U.S. Claims LEXIS 712, at *3 (Fed. Cl. Apr. 20, 2023) (quoting *Barnes v. United States*, 538 F.2d 865, 873 (Ct. Cl. 1976); and citing *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012)). In other words, "stabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined. . . . [O]nce it is clear that the process has resulted in a permanent taking and the extent of the damage is reasonably foreseeable, the claim accrues and the statute of limitations begins to run." *Boling v. United States*, 220 F.3d 1365, 1370-71 (Fed. Cir. 2000). This stabilization approach is derived from the Supreme Court's decision in *United States v Dickinson*, 331 U.S. 745 (1947), when the Court rejected the contention that the plaintiff's takings claim accrued immediately upon the first inundation of the property, given that the frequency and permanency of the flooding was uncertain, and held that the takings claim did not

accrue until the flooding had become "stabilized."  Further explaining the doctrine, the Federal

Circuit stated that:

> Properly understood, stabilization as discussed in *Dickinson* is not deferred until the progressive environmental damage stops, but occurs when the environmental forces have substantially and permanently invaded the private property such that the permanent nature of the taking is evident and the extent of the damage is reasonably foreseeable.

*Boling*, 220 F.3d at 1371.

Under the circumstances of this case, the court finds that Plaintiffs' federal takings claims

under Count One accrued sometime before July 2020, at which point the statute of limitations

began to run.  Notably, the court has already determined that Riveredge could have presented a

viable federal takings claim in the second amended complaint, which was filed in October 2020

(ECF Doc. 1-4).  ECF Doc. 28 at 14-16. The court noted that Riveredge was not required to

experience structural damages before bringing a takings claim and stated that the inability to rent

the basement units and the intermittent interference with Riveredge's and enjoyment of the

condominium was sufficient.  *Id.* at 15.  Under the law of the case doctrine, "a decision on an

issue made by a court at one stage of a case should be given effect in successive stages of the

same litigation."  *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990); *see also Rouse v.

DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002).

The record also demonstrates that Plaintiffs knew or had sufficient reason to know that a

federal takings claim had accrued by July 2020; specifically, that Cleveland had taken a

permanent flowage/drainage easement on Plaintiffs' property without just compensation.

Waters's deposition, the sworn affidavits of Waters, Shah, Dr. Kim, and Sunna, the July 12, 2019

letter from the legal counsel of West Valley (the condominium association that Plaintiffs are all

members of), and the Jasinski Report all demonstrate that Plaintiffs were aware of the

intermittent and continual flooding of the Building following the construction of the KMPL improvements in Summer 2019.  *See* ECF Doc. 47-1 at 13; EF Doc. 49-13 at 1-8; ECF Doc. 49-14; ECF Doc. 40-4 at 5-6.  Plaintiffs also provided a July 2023 sworn affidavit by Waters, wherein he attests that he recorded the date of each flood in a log which was kept in the basement of the Building.  ECF Doc. 40-1, Ex. A Waters's Aff. at 3-4.[10]  The attached flood log indicated that there were: (i) seven floods between June 1, 2019 and July 17, 2019; (ii) several flood events between July 22, 2019 and March 28, 2020 that were not recorded due to family circumstances; and (iii) three floods between March 28, 2020 and July 2020.  ECF Doc. 40-1, Ex. A (West Valley Flood Log).  Michael Maly, a tenant in one of the basement units in the Building, attested that his office flooded with storm water no less than seven time between May 28, 2019 and July 17, 2019.  ECF Doc. 40-2 at 1.

The various pleadings in this case also demonstrate Plaintiffs' actual or constructive knowledge.  The amended complaint, filed on May 28, 2020, alleged that stormwater from the KMPL had flooded the Building "on numerous occasions between May and September 2019" and listed the following dates: "May 29-30, June 10, 13, 18, 20, 24, 28, July 4, 6, 22 and August 6 and 19 [2022]."  ECF Doc. 1-2 at 4.  The second amended complaint, filed on October 23, 2020, alleged that flooding had occurred "*at least* 40 times since May 29, 2019."  ECF Doc. 1-3 at 8 (emphasis added).  Even the instant pleadings allege that Plaintiffs' property has been intermittently flooded by stormwater over 50 times since July 2019.  ECF Doc. 14 at 13.

Plaintiffs' argument that they had no reason to believe a takings claim had accrued until they were informed of structural damage in December 2022 is unavailing.  Plaintiffs did not need direct evidence of structural damage for their takings claim to accrue.  In *Dickinson*, the Supreme

---

[10] Waters's July 2023 affidavit and its accompanying exhibit were manually filed with the court.  *See* ECF Doc. 40-1.

Court held that intermittent flooding of private land can result in the taking of an easement, providing that: "Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time." 331 U.S. at 748.  The Supreme Court has recognized that the right to exclude is a "fundamental element of the property right," and "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 179-80 (1979). The government has a categorical duty to compensate a property owner when it "physically takes possession of an interest in property for some public purpose." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002).

It was clear that Plaintiffs were aware that stormwater from the KMPL improvements was flooding their property as early as the Summer of 2019, which violated Plaintiffs' property rights but did not give rise to a takings claim at that time, given the uncertainty of whether the flooding would keep recurring.  However, Plaintiffs' takings claim is deemed to have accrued sometime before July 2020 because, by that time (and probably much sooner), it was clearly apparent that the intermittent flooding was of a sufficiently recurring nature that a permanent taking had occurred – with Cleveland taking a flowage or drainage easement on Plaintiffs' property without providing just compensation.[11]  *See Robertson*, 2023 U.S. Claims LEXIS 712, at *3; *Boling*, 220 F.3d at 1370-71.  In defending their takings claims, Plaintiffs have explicitly

---

[11] The flooding in the basement would not have solely affected the property interests of Riveredge (the owner of the basement condominium units), but also the remaining plaintiffs who had a legal or property interest in the common area of the basement.  While the basement condominium units flooded, the water allegedly seeped through the foundational walls and occupied the hallways and mechanical room of the basement (all common elements that Riveredge, Shah Trust, Dr. Kim, and KP, LLC had a property interest in).  *See* ECF Doc. 40-4 at 9-13, 26-32; ECF Doc. 58-1 at 4.

asserted that Cleveland violated their right to exclude: "Cleveland's KMPL stormwater discharge unequivocally infringes, impairs and destroys Plaintiffs right to possess, use, occupy, dispose, improve and *exclude* others (notably Cleveland) from their Property and thus has destroyed their reasonable investment backed ownership expectations."  ECF Doc. 40 at 21 (emphasis added).  It would have been clearly apparent to a reasonable person that, after double digit incidents of flooding within the first few months of the KMPL improvements being completed, and certainly after a year of persistent flooding (by July 2020), the flooding of the Building was inevitably recurring and that damages from this flooding were reasonably foreseeable (*e.g.*, foundation and structural damage).[12]

### c.        Continuing Violation Doctrine

Even if their takings claims accrued before July 2020, Plaintiffs contend that the statute of limitations is tolled pursuant to "*Doner* tolling."  ECF Doc. 58 at 11-12.  Plaintiffs cite the Ohio Supreme Court's decision in *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446 (2011), and its holding that: "when an act carried out on the actor's own land causes continuing damage to another property and the actor's conduct or retention of control is of a continuing nature, the statute of limitations is tolled."  ECF Doc. 58 at 12 (alteration adopted).  Plaintiffs further argue that *Doner* tolling is in accord with the federal "continuing violation" doctrine and should provide for tolling of the statute of limitations.  *Id.* at 11-12.

---

[12] Although the issue of when a statute of limitations has accrued and whether plaintiffs have constructive notice of their claims are generally an issue of fact for the jury, it is clear that a district court may issue a determination on the issue provided that the relevant facts are undisputed.  *See, e.g.*, *Twee Jonge Gezellen, Ltd. v. Owens-Illinois, Inc.*, 238 F. App'x 159, 163 (6th Cir. 2007); *Adcor Indus. v. Bevcorp*, LLC, 411 F. Supp. 2d 778, 786 (N.D. Ohio 2005) (collecting cases).  That is the situation here, as the court has relied on evidence provided by Plaintiffs and undisputed facts to make the determination that the statute of limitations accrued before July 2020.

First, although the statute of limitations is determined by reference to Ohio law, it is federal law that determines when a § 1983 claim accrues and when the statute of limitations for such a claim begins to run.  *Cooey*, 479 F.3d at 416; *Wallace*, 549 U.S. at 388. ("[T]he accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law.").  Therefore, the court finds Plaintiffs' appeals to "*Doner* tolling" unavailing but will look to whether the statute of limitations is tolled under the "continuing violation" doctrine.

As discussed above, the statute of limitations for § 1983 claims generally begins to run when the plaintiffs know or have reason to know of the injury which is the basis of their action. *Beaver St. Invs.*, 65 F.4th at 826 (6th Cir. 2023); *see also Ruff*, 258 F.3d at 500.  However, the "continuing violation" doctrine provides an exception to this rule and allows for tolling of the statute of limitations in certain instances.  *Hensley v. City of Columbus*, 557 F.3d 693, 697 (6th Cir. 2009); *McNamara*, 473 F.3d at 639.  A "continuing violation" exists when: (i) the defendants engage in continuing wrongful conduct; (ii) injury to the plaintiffs accrues continuously; and (iii) had the defendants at any time ceased their wrongful conduct, further injury would have been avoided.  *Hensley*, 557 F.3d at 697 (citing *Kuhnle Bros.*, 103 F.3d at 521; and *McNamara*, 473 F.3d at 639); *see also Tolbert v. State of Ohio Dep't of Transp.*, 172 F.3d 934, 939 (6th Cir. 1999).

However, this doctrine is seldom applicable, with the Sixth Circuit warning that the continuing violation doctrine is applied most commonly in Title VII cases and rarely extended to § 1983 actions.  *See Sharpe v. Cureton*, 319 F.3d 259, 266-67 (6th Cir. 2003); *see also Slorp v. Lerner, Sampson & Rothfuss*, 587 F. App'x 249, 257 (6th Cir. 2014) ("Courts have been 'extremely reluctant' to extend the continuing-violation doctrine beyond the context of Title VII[.]" (internal citations omitted)); *Evans v. City of Ann Arbor*, No. 21-10575, 2022 U.S. Dist.

34

LEXIS 34603, at *25-26 (E.D. Mich. Feb. 25, 2022) (citing *Sharpe*, 319 F.3d at 266-67);

*Peterson v. Ostrander*, No. 17-2160, 2018 U.S. App. LEXIS 8902, at *5-6 (6th Cir. Apr. 6,

2018) ("The continuing violation doctrine is 'rarely' applied in § 1983 cases.") (citation

omitted).

The Sixth Circuit has also distinguished instances when there was a continuing violation

from situations that involved the continuing effects of prior violations, stating: "[T]he present

effects of past discrimination . . . do not trigger a continuing violations exception." *Ohio*

*Midland, Inc. v. Ohio Dep't of Transp.*, 286 F. App'x 905, 912 (6th Cir. 2008) (quoting

*Tenenbaum v. Caldera*, 45 F. App'x 416, 419 (6th Cir 2002)) (internal quotation marks omitted).

The Sixth Circuit has made clear that "[a] continuing violation is occasioned by continual

unlawful acts, not continual ill effects from an original violation." *Broom v. Strickland*, 579 F.3d

553, 555 (6th Cir. 2009) (quoting *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635

(6th Cir. 2007)); *see also Rivera v. United States*, 204 F. Supp. 2d 305, 315 (D.P.R. 2002) ("A

continuing violation occurs when there is a series of continual unlawful acts, not when there are

merely continual harmful effects from an original unlawful act.") (collecting cases).  "Passive

inaction does not support a continuing violation theory." *Eidson*, 510 F.3d at 635.

This is not a "continuing violation" case.  "A continuing wrong is established by

continuing tortious acts, not by continual harmful effects from an original, completed act." *Vill.*

*of Milford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th Cir. 2004).  The wrongful

conduct/violation Plaintiffs have alleged in this case is the combined design and construction of

the KMPL improvements, which was primarily completed in May-June 2019.  *See* ECF Doc. 14

at 6-17; ECF Doc. 37 at 4.  The persistent, intermittent flooding of Plaintiffs' property after the

completion of these improvements and the resulting damages are the effects/injuries that stem

from a single, discrete event – the design and construction of the KMPL improvements.  The continuing violation doctrine does not apply because Plaintiffs have not pointed to any *ongoing*, wrongful conduct that, if ceased, would prevent further injury.  To find a continuing violation, the defendant's wrongful conduct must be continuous in nature; and Plaintiffs cannot merely point to the continuing, resulting harm.  Moreover, Cleveland's alleged failure to take remedial action to prevent further flooding does not support tolling of the statute of limitations because "[p]assive inaction . . . does not support a continuing violation theory."  *Eidson*, 510 F.3d at 635; *Tolbert*, 172 F.3d at 940; *see, e.g.*, *Cline v. City of E. Liverpool*, No. 4:22-CV-01435-CEH, 2023 U.S. Dist. LEXIS 213642, at *9 (N.D. Ohio Dec. 1, 2023) (declining to apply the continuing violation doctrine when the defendant city removed several storm inlet basins and repaved a street that adjoined the plaintiffs' property, which resulted in rainwater flooding that property).

In similar cases when governmental entities completed construction of projects that resultingly caused ongoing flooding or erosion damage to a plaintiff's property, district courts have declined to apply the continuing violation doctrine.  *See, e.g.*, *Banks v. United States*, 88 Fed. Cl. 665, 670 n.4 (2009) (declining to apply the doctrine when the construction and maintenance of jetties by the United States Army Corps of Engineers caused continual erosion to the plaintiffs' property); *Rivera*, 204 F. Supp. 2d at 315 (D.P.R. 2002) (declining to apply the doctrine based on allegations that government agents were negligent in supervising and overseeing the construction of the plaintiffs' homes which resulted in continual flooding); *accord Marseilles Hydro Power, L.L.C. v. Marseilles Land & Water Co.*, No. 00 C 1164, 2005 U.S. Dist. LEXIS 34103, at *11 (N.D. Ill. Dec. 16, 2005) (declining to apply the doctrine when plaintiff alleged damages resulting from intermittent flooding caused by a discrete event – the

defendants damaging a drainage pipe).  Thus, the two-year statute of limitations was not tolled by the continuing violation doctrine in this case.

### d.    Relation Back

Having determined that the statute of limitations began running sometime before July 2020, and was not tolled by the continuing violation doctrine, the two-year statute of limitations for Plaintiffs to bring their federal takings claim would have expired by July 2022 at the latest. Riveredge timely asserted a federal takings claim in the third amended complaint, filed in May 2022.  ECF Doc. 1-5 at 1, 15-16.  But the remaining plaintiffs did not assert a federal takings claim until they were added as plaintiffs to this action in the fourth amended complaint, filed in August 2022.  ECF Doc. 14 at 1, 17-20.

"Under Rule 15, a plaintiff may amend her pleading to add a new claim or defense that would otherwise be time-barred when the amended pleading 'relates back' to the original timely-filed pleading."  *Gibbens v. OptumRx, Inc.*, 778 F. App'x 390, 394 (6th Cir. 2019) (citing *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010)).  "A pleading amendment 'relates back' to the original pleading when the new claim arises 'out of the conduct, transaction, or occurrence set forth' in the original pleading.'"  *Id.* (citing *Mayle v. Felix*, 545 U.S. 644, 656 (2005); Fed. R. Civ. P. 15(c)(1)(B)).  Because Riveredge was the original plaintiff in this action and its federal takings claim arises out of the conduct, transaction, or occurrence set forth in the original pleadings, the claim relates back to the original complaint (filed in May 2020) and the statute of limitations does not bar Count One for Riveredge no matter when the claim first accrued.

Unfortunately, Rule 15 does not work to save the remaining plaintiffs from the expiration of the statute of limitations.  Rule 15(c) provides the standard for determining whether claims

"relate back" in federal cases.  Under Rule 15(c), an amendment to a pleading relates back to the date of the original pleading when:

> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>>
>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c).  Here, subsection (C) is the portion of the Rule at issue, as it involves amendment of the pleadings to name or change parties.  The Sixth Circuit has held that Rule 15(c) and the "relation-back" doctrine do not apply when an amended complaint adds new plaintiffs.  *Kellom v. Quinn*, 86 F.4th 288, 294 (6th Cir. 2023); *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318-19 (6th Cir. 2010).  In *Kellom*, the Sixth Circuit explained:

> Generally, when an amended complaint adds claims or parties who weren't previously part of the lawsuit, the lawsuit "commence[s]" for those claims and parties when they are added.  *See* Fed. R. Civ. P. 3; *United States ex rel. Statham Instruments, Inc. v. W. Cas. & Sur. Co.*, 359 F.2d 521, 524 (6th Cir. 1966).  In limited circumstances, the Federal Rules treat claims in an amended complaint as if they had been brought on the date of the original complaint.  Fed. R. Civ. P. 15(c). But this "relation-back" doctrine doesn't apply when the amended complaint adds a new plaintiff.  *See* Fed. R. Civ. P. 15(c)(1)(C); *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318-19 (6th Cir. 2010); Wright & Miller, Federal Practice § 1501 (3d ed. Apr. 2023 update).

*Kellom*, 86 F.4th at 294.[13]

---

[13] In *Asher*, the Sixth Circuit explained the basis of this decision in more detail, explaining that: "Rule 15(c)(1)(B) allows relation back of an amendment asserting a 'claim or defense,' but it does not authorize

West Valley, Shah Trust, Dr. Kim, KP, LLC, and RDI (collectively, the "New Plaintiffs") were all added as plaintiffs in the fourth amended complaint. *See* ECF Doc. 14 at 1-5. These plaintiffs were not added to correct a misnomer or misdirection of a proper party plaintiff already before the court; therefore, their federal takings claims cannot relate back to the original pleading to circumvent the expiration of the statute of limitations. *See Kellom*, 86 F.4th at 294; *Asher*, 596 F.3d at 318-19. As such, the statute of limitations bars Count One as to the New Plaintiffs because: (i) the state of limitations expired by July 2022; and (ii) the new plaintiffs filed their federal takings claims and joined this action in August 2022.

Accordingly, the court will DISMISS Count One as to the New Plaintiffs.

## 2. Merits Analysis

Because the statute of limitations does not bar Riveredge's federal takings claim, the court will analyze the merits of the claim.

For Count One, Riveredge[14] seeks relief pursuant to 42 U.S.C. § 1983, which provides individuals with a cause of action who have been "deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004); *see* 42 U.S.C. § 1983. To state a § 1983 claim, a plaintiff must allege two elements: "(1) the defendant acted under color of state law;" and (2) the defendant's conduct deprived the plaintiff of rights secured under federal law."

---

the relation back of an amendment adding a new party. Similarly, Rule 15(c)(1)(C) permitting relation back of an amendment changing a party or its name applies, by its plain language, to changes to defendants. . . . Although various courts have extended the relation-back provisions of Rule 15(c)(1)(C) to amendments changing identities of plaintiffs, the type of 'changes' permitted are limited to corrections of misnomers or misdescriptions. 596 F.3d at 318-19 (internal citations omitted).

[14] Because Count One has been dismissed as to all other plaintiffs, the court will refer to Riveredge in lieu of Plaintiffs when appropriate for the remainder of its Count One analysis.

39

*Chambers v. Sanders*, 63 F.4th 1092, 1096 (6th Cir. 2023) (quoting *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (internal quotation marks omitted).

Riveredge asserts an inverse condemnation takings claim, contending that Cleveland has unconstitutionally taken its property in violation of the Fifth and Fourteenth Amendments.  ECF Doc. 14 at 17-20.  Under current Supreme Court precedent, "a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2170 (2019).  The Takings Clause of the Fifth Amendment states: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V, cl. 4.  "If a local government takes private property without paying for it, that government has violated the Fifth Amendment . . . [a]nd the property owner may sue the government at that time in federal court for the 'deprivation' of a right 'secured by the Constitution.'" *Knick*, 139 S. Ct. at 2170 (quoting 42 U.S.C. § 1983).  For inverse condemnation claim, a plaintiff initiates proceedings against a "governmental defendant to recover the value of property which has been taken in fact by the governmental defendant[,] whereas for direct condemnation, "the government initiates proceedings to acquire title under its eminent domain authority." *Id.* at 2168.

"Inverse condemnation law is tied to, and parallels, tort law.  Thus, not every invasion of private property resulting from government activity amounts to an appropriation." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003) (internal citation and quotation marks omitted).  In *Ridge Line*, the Federal Circuit confronted this issue and addressed the scenario of whether government-induced increased water runoff onto private property constituted a taking of a flowage easement by inverse condemnation and applied a two-pronged test to determine whether a taking had occurred instead of a tort. *Id.*  Courts in the Sixth Circuit have adopted this

two-part test when addressing inverse condemnation claims.  *See, e.g.*, *Mays v. TVA*, 699 F. Supp. 2d 991, 1026 (E.D. Tenn. 2010); *In re TVA Ash Spill Litig.*, 805 F. Supp. 2d 468, 492 (E.D. Tenn. 2011); *see also Martinus v. Vill. of Spring Lake*, No. 1:20-cv-985, 2023 U.S. Dist. LEXIS 44360, at *12 (W.D. Mich. Feb. 14, 2023) ("The Court engages in a two-part inquiry to distinguish potential physical takings from possible torts." citing *Ridge Line*, 346 F.3d at 1355).

Under the first prong (causation), "a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action."  *Ridge Line*, 346 F.3d at 1355 (quotation marks omitted); *see also Golf Vill. N., LLC v. City of Powell*, 14 F.4th 611, 620-21 (6th Cir. 2021) (reciting the language in *Ridge Line* and applying the two-part test).  Under the second prong (appropriation):

> [T]he nature and magnitude of the government action must be considered.  Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value.

*Id.* at 1356.

In *Ark. Game*, the Supreme Court held that government-induced flooding was not exempted from "Takings Clause inspection" merely because the flooding was temporary or intermittent.  *See* 568 U.S. at 39.  "Because government-induced flooding can constitute a taking of property, and because a taking need not be permanent to be compensable, our precedent indicates that government-induced flooding of limited duration may be compensable."  *Id.* at 34.  In flooding cases, whether a government action rises to the level of a constitutional taking is a situation-specific factual inquiry.  *Id.* at 24, 37.  For takings cases involving temporary

government-induced flooding, the Supreme Court has instructed courts to consider some of the

following factors: (i) duration and frequency of the flooding; (ii) severity of the interference with

property interests; (iii) whether the flooding was intended or a foreseeable result of the

government's action; (iv) the character of the land at issue; and (v) the owner's reasonable

investment-backed expectations.  *See id.* at 38-39; *see also Cedar Point Nursery v. Hassid*, 141

S. Ct. 2063, 2078 (2021) ("Because this type of flooding can present complex questions of

causation, we instructed lower courts evaluating takings claims based on temporary flooding to

consider a range of factors including the duration of the invasion, the degree to which it was

intended or foreseeable, and the character of the land at issue.").  Notably, courts have cautioned

that, "due to the fact-intensive nature of takings cases, summary judgment should not be granted

precipitously."  *See Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005).

Applying the *Ark. Game* factors to this case, the court is unable to determine whether the

intermittent flooding of the Building was a compensable taking under the Fifth Amendment at

the summary judgment phase.  There are genuine issues of material fact concerning the character

of the land and whether the flooding of the Building was intended or foreseeable, that preclude

the court from granting summary judgment in favor of either party.

Plaintiffs' motion for summary judgment argues, in part, that Cleveland intended to

divert stormwater away from the Albers Sewer and onto Plaintiffs' property.  ECF Doc. 40 at

18-20.  To prove the requisite intention for a federal takings claim, Riveredge must demonstrate

that Cleveland intended to invade Riveredge's protected property interest.  *See Ridge Line*, 346

F.3d at 1355.  In other words, Riveredge cannot simply demonstrate that Cleveland intended to

divert stormwater away from the Albers Sewer; it must demonstrate that Cleveland intended to

divert the stormwater onto 3865 Rocky River Drive and into the Building.  It is undisputed that

Cleveland intentionally diverted stormwater into the stormwater basins constructed as part of the KMPL improvements and away from the Albers Sewer.  *See* Doc. 37.  But Riveredge has provided no evidence which establishes that it was Cleveland's intent to divert the stormwater so that it flowed onto Plaintiffs' property.  *See* ECF Doc. 40 at 18-20.  Instead, Riveredge's arguments and evidence tend to demonstrate causation (the flooding of the basement was the result of the stormwater diversion) and are better suited to establishing foreseeability (the flooding of the basement was a foreseeable result of the KMPL improvement) instead of intention (Cleveland intended the KMPL improvement to flood the basement with stormwater).

Because Riveredge has not sufficiently established Cleveland's intention to affect a taking, it must demonstrate that the alleged invasion of its rights was the direct, natural, or probable result of the KMPL improvements and not "the incidental or consequential injury inflicted by the [improvements]."  *Ridge Line*, 346 F.3d at 1355.  Foreseeability and causation are required elements for any physical takings claim.  *See id.* at 1355-56; *Cary v. United States*, 552 F.3d 1373, 1379-80 (Fed. Cir. 2009) ("Foreseeability and causation are separate elements that must both be shown (when intent is not [established]).").  Thus, the court must determine whether Riveredge's alleged injuries were a reasonably foreseeable consequence of Cleveland's actions.  *Moden*, 404 F.3d at 1343 ("However, proof of causation, while necessary, is not sufficient for liability in an inverse condemnation case.  In addition to causation, an inverse condemnation plaintiff must prove that the government should have predicted or foreseen the resulting injury.") (internal citation omitted).  In other words, to succeed on summary judgment, Riveredge must demonstrate that Cleveland knew, or should have known, that the KMPL improvements and the diversion of stormwater away from the Albers Sewer would result in

flooding and damage to the Building and Riveredge's basement units, before the improvements were constructed.

On the flip side, Cleveland moves for summary judgment, in part, on the grounds that Riveredge cannot demonstrate Cleveland intended or foresaw the alleged injuries and flooding. ECF Doc. 49 at 31-33.  Cleveland must demonstrate that, when it engaged in the construction of the KMPL improvements, it could not have reasonably known that the KMPL improvements and the diversion of stormwater away from the Albers Sewer would have resulted in flooding and damage to the Building and Riveredge's basement units.

Based on the Rule 56 evidence presented by the parties, it is not clear whether Cleveland could have reasonably foreseen the alleged damage to and invasion of Riveredge's property.  At least not clear enough to satisfy the summary judgment standard – that no reasonable jury could decide the issue in favor of Riveredge or Cleveland.  Plaintiffs have presented evidence, in the form of the Jasinski Report, which indicates that Cleveland had reason to anticipate the flooding of the Building and Riveredge's property.[15]  *See* ECF Doc. 40-4 at 10-13.  The Jasinski Report contends that the structural damage and flooding of the Building is the result of the poor design of the stormwater basins and its placement next to the Building, stating that Cleveland's design: (i) failed to provide a minimum slope away from the Building; (ii) located the stormwater basins too close the Building's foundation walls; and (iii) prevented free drainage of the ground water away from the Building.  *Id.*

On the other hand, Cleveland has presented evidence suggesting that alleged flooding of the Building and its basement was not reasonably foreseeable.  Cleveland provides evidence that demonstrates the planning and design of the KMPL improvements (specifically the stormwater

_____

[15] As determined above, the court sustained Cleveland's objection and has declined to use Vondra's affidavit for purposes of deciding the cross motions for summary judgment.

basins) was a lengthy and involved process, which: (i) included review and input from environmental groups, agencies, engineers, and other professionals: (ii) involved soil and other environmental testing; and (iii) demonstrated that the specification and plan was sufficient to capture and drain stormwater.  *See* ECF Docs. 49-1, 49-16; ECF Doc. 40-1, Pls' Dep. Exs. 17, 19, 22-23.

At the summary judgment stage, it is inappropriate for the court to make credibility determinations or weigh conflicting evidence.  *Kermavner*, 250 F. Supp. 3d at 329; *Alspaugh v. McConnell*, 643 F.3d 162, 168-69 (6th Cir. 2011).  Thus, the court concludes that there is a genuine issue of material fact concerning the foreseeability of the alleged injuries to Riveredge's property.  As such, summary judgment is not appropriate with respect to this issue.  Because Riveredge cannot maintain a federal takings claim without establishing foreseeability, the court will DENY Plaintiffs' motion for summary judgment as to Count One.

Cleveland raises two other arguments in its motion for summary judgment as to why it is entitled to summary judgment on the merits of Count One.  It argues that Riveredge cannot maintain a takings claim because: (i) the character of the land at issue; and (ii) it cannot establish an interference with its reasonable investment-based expectations.  ECF Doc. 49 at 28-31.  The court finds neither argument dispositive.

Cleveland provides three primary reasons for why the character of the land weighs against a viable takings claim.  First, Cleveland contends that the Building adjoins/intersects with the Albers Sewer, it was "built directly within the existing right of way and easements for the benefit of the City," and Riveredge took its property interest subject to this existing easement.  ECF Doc. 49 at 29.  It is undisputed that the Building was built adjoining and intersecting the Albers Sewer.  However, Cleveland has provided no written documentation of the alleged

easement.  Additionally, to the extent such an easement exists (whether written or by prescription), the court concludes that the flooding alleged in this action would clearly exceed the scope of any such easement and could constitute an unconstitutional taking by Cleveland.

Second, Cleveland contends that the Building is naturally located downstream from the KMPL, and 860,000 gallons of stormwater naturally flow towards the Building each year.  ECF Doc. 49 at 29.  While this information certainly weighs in favor of Cleveland, it is not dispositive; particularly given that informs only one of the five factors that must be considered for a takings claim.  *See Ark. Game*, 568 U.S. at 38-39.  Finally, Cleveland states that Plaintiffs have admitted that there was a stormwater problem long before the KMPL improvements were completed.  ECF Doc. 49 at 29-30.  Cleveland cites specific statements in Waters's affidavit, Waters's deposition, and in West Valley's letter to Cleveland.  *Id.* at 30; ECF Doc. 64 at 16. However, those statements merely support that there were general stormwater issues that affected various properties around the KMPL and do not admit to issues with continual, intermittent flooding of the Building and its basement.  *See* ECF Doc. 40-1 at 2; ECF Doc. 49-14 at 1; ECF Doc. 47-1 at 28.  Cleveland also points to testimony that a second sump pump was installed before 2019 in one of the basement units because of prior flooding.  ECF Doc. 47-1 at 26-27.  But Plaintiffs have provided the affidavit of Michael Maly, a tenant in one of Riveredge's basement units, who attested that there was only flooding due to stormwater runoff twice in the twenty-one year period between 1998 and the 2019 completion of the KMPL improvements. ECF Doc. 40-2 at 1.

Cleveland posits that it cannot be held liable for a takings claim because it cannot be held liable for failing to take affirmative steps to halt the natural flow of stormwater from its property

onto Riveredge's property, citing *United States v. Sponenbarger*.[16]  However, this case is easily distinguishable, as it is not the case that Cleveland merely failed to take steps to restrict the *natural flow* of water onto Riveredge's property.  Rather, Cleveland's property is a paved parking lot that employed an established system (curbs, basins, and drains) for moving stormwater into the sewer system for at least several decades.  In 2019, Cleveland designed and constructed the KMPL improvements with the purpose of diverting stormwater away from the sewer system.  Thus, Cleveland took affirmative steps to alter the status quo, which has allegedly resulted in persistent, intermittent flooding at a level that did not exist before this alteration occurred.  As such, the instant case is distinguishable from *Sponenbarger*.

The court further finds that the alleged flooding in this case affected Riveredge's reasonable investment-backed expectations.  As the court previously determined in its December 21, 2022 Order, the recurrent flooding deprived Riveredge of the ability to rent its basement units and "[p]roperty subject to intermittent flooding is inherently less able to be rented."  ECF Doc. 28 at 15.  For the same reason the court rejected Cleveland's arguments under the character of the land factor, the court rejects the city's argument that Riveredge did not have sufficient expectations to rent the condominium units because of the location of the Building and the knowledge of prior stormwater issues.  ECF Doc. 49 at 30-31.

For the sake of completeness, the court turns to the remaining *Ark. Game* factors: (i) duration and frequency of the flooding; and (ii) severity of the interference with property interests.  *See* 568 U.S. at 38-39.  It is incumbent on the moving party to demonstrate "the basis for its motion" and to show that there is no genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 323.  Here, Cleveland did not brief or argue these remaining factors.  *See* ECF Doc. 49 at 12-32.

---

[16] 308 U.S. 256 (1939).

As such, the court is left with insufficient briefings and arguments on the matter and the court declines to do the parties' work for them.  Whether the alleged flooding was foreseeable, the character of the land supports a takings claim, and whether Riveredge's expectations in the property were reasonable, are all questions of fact that require further elucidation at trial and properly belong in the hands of the jury.

Because there are issues of material fact as to foreseeability and because Cleveland has not otherwise established that there are no issues of material fact on whether there was a taking under the *Ark. Game* factors, the court will DENY summary judgment in favor of either party on Count One as to Riveredge.

### D.    Count Two –Takings Claims under Ohio Law

The parties have filed cross motions for summary judgment as to Count Two.  ECF Doc. 40 at 16-21; ECF Doc. 49 at 25-27, 33-34.  Relatedly, Plaintiffs have filed a motion to amend the complaint to fix certain pleading deficiencies.  ECF Doc. 57.  After reading the parties' motions and associated briefing, the court identifies three distinct issues concerning Count Two that must be addressed before consideration of the merits: (i) whether this court has the authority to grant the writ of mandamus sought by Plaintiffs; (ii) whether to grant Plaintiff's motion to amend the complaint (ECF Doc. 57) or dismiss Count Two for failure to comply with Ohio Rev. Code § 2731.04; and (iii) whether this court should abstain from determining Count Two.

### 1.    The Court's Authority to Grant a Writ of Mandamus

In the fourth amended complaint's request for relief, Plaintiffs asks this court to issue a writ of mandamus compelling Cleveland to initiate appropriation proceedings pursuant to Ohio Rev. Code § 163.01, *et seq.*  ECF Doc. 14 at 25.  In a puzzling move, Plaintiffs seemingly argue

48

that this court lacks jurisdiction to grant such relief.  *See* ECF Doc. 57 at 1; 58 at 15-16.  If Plaintiffs are correct, the court could not grant any relief under Count Two and would be compelled to dismiss or remand Count Two to state court.[17]

Fed. R. Civ. P. 81(b) formally abolished writs of mandamus.  *Haggard v. Tennessee*, 421 F.2d 1384, 1385 (6th Cir. 1970).  However, district courts can issue such writs pursuant to the All Writs Act, 28 U.S.C. § 1651, which provides that "[t]he Supreme Court and all other courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  *See id.*; 28 U.S.C. § 1651(a).  "[A] federal court must have an independent basis for subject matter jurisdiction for a writ of mandamus to be issued pursuant to 28 U.S.C. § 1651(a)."  *Maczko v. Joyce*, 814 F.2d 308, 310 (6th Cir. 1987).

Although few in number, the district courts that have addressed the issue have determined that federal courts, who otherwise have subject matter jurisdiction over a case, also have the authority to issue writs of mandamus to initiate appropriation proceedings for a takings claim under the Ohio Constitution.  *See, e.g.*, *Vary v. City of Cleveland*, 206 F. Supp. 3d 1273, 1277 (N.D. Ohio 2016) ("This Court, sitting in diversity, can issue a writ of mandamus that Ohio courts are able to grant.  Moreover, subject matter jurisdiction exists here, under 28 U.S.C. § 1332(a) . . . .  Accordingly, this Court has jurisdiction to issue a writ of mandamus."); *Cal. Pac. Hosp. v. City of Norwood*, No. 1:18cv294, 2019 U.S. Dist. LEXIS 47639, at *8 (S.D. Ohio Mar. 22, 2019) (same); *see also Harrison v. Jefferson Par. Sch. Bd.*, No. 20-2916, 2020 U.S. Dist. LEXIS 217655, at *26-27 (E.D. La. Nov. 20, 2020) ("Although mandamus is an extraordinary remedy, when considering a Louisiana state law claim, a writ of mandamus 'must

---

[17] A conclusion noted by Cleveland in its reply in support of its motion for summary judgment.  ECF Doc. 64 at 18.

be available in federal court to the same extent as in the courts of [Louisiana].'" (quoting *In re Huffines Partners Retail, L.P.*, 978 F.3d 128, 134-35 (5th Cir. 2020) (alteration in original)).  It does not appear that any other district courts within this Circuit have directly addressed this issue, nor has any court dismissed or remanded a mandamus claim for inverse condemnation under Ohio law for lack of jurisdiction based on a lack of authority to issue such a writ.

Although this case differs from *Vary*, in that the court has federal question jurisdiction under 28 U.S.C. § 1331 rather than diversity jurisdiction under 28 U.S.C. § 1332, the court finds that the basis for subject matter jurisdiction does not alter the analysis of the court's authority to issue a writ of mandamus.  *See Rancho Del Oso Pardo, Inc. v. N.M. Game Comm'n*, No. CIV 20-427 SCY/KK, 2021 U.S. Dist. LEXIS 43716, at *10-12 (D.N.M. Mar. 9, 2021) (determining that a federal court has jurisdiction to issue a writ of mandamus to a state commission pursuant to state law when exercising supplemental jurisdiction, citing reasoning under *Vary v. Cleveland*).  It is undisputed that this court has subject matter jurisdiction pursuant to 28 U.S.C § 1331 (federal question jurisdiction), based on Plaintiffs having asserted a takings claims under the Fifth Amendment, and the court would therefore have supplemental jurisdiction over Plaintiffs' state law takings claims.  Accordingly, this court has jurisdiction to issue the writ of mandamus requested by Plaintiffs.[18]

### 2.     Pleading Requirements under Ohio Rev. Code § 2731.04

#### a.     The Parties' Arguments

In its motion for summary judgment, Cleveland argues that Count Two must be dismissed because an Ohio inverse condemnation claim can only be brought through a

---

[18] Despite finding the court has jurisdiction to do so, issuing a writ compelling a state municipality to initiate state proceedings raises comity concerns that will factor into the court's determination of the abstention issue below.

mandamus action, and it claims Plaintiffs did not comply with the statutory requirements for initiating a mandamus proceeding under Ohio law (Ohio Rev. Code § 2731.04).  ECF Doc. 49 at 33-34.  Specifically, Cleveland argues that: (i) Ohio Rev. Code § 2731.04 requires a request for mandamus "must be by petition, in the name of the state on the relation of the person applying"; (ii) a mandamus claim must be dismissed when the relator has had a an opportunity to amend the complaint to comply with the statute and failed to do so; and (iii) here, Plaintiffs had several opportunities to amend the complaint but they "failed to file a Petition listing the Relators and a Respondent."  *Id.*

Plaintiffs respond that Ohio Rev. Code § 2731.04 is inapplicable and null in this action because: (i) this court lacks the authority to issue a writ of mandamus "compelling Cleveland to initiate appropriation proceedings in state court"; and (ii) Cleveland is estopped from demanding compliance with Ohio Rev. Code § 2731.04 since it "removed this action from state court knowing that this court lacks mandamus authority."  ECF Doc. 58 at 15-16.  They further argue that the caption of the pleadings has substantially complied with all other state pleading requirements, and note that they had no opportunity to seek leave to amend any pleading deficiency before Cleveland removed the case to federal court.  *Id.* at 16.  Finally, they note they will seek leave to amend the complaint and argue that: (i) Ohio courts will grant leave to amend when a § 2731.04 pleading deficiency has been raised and the relator subsequently moves to fix the deficiency; and (ii) Rule 15(b) provides for the liberal amendment of pleadings and Cleveland will not be prejudiced by such an amendment.  *Id.* at 16-17.

Cleveland replies that Plaintiffs have not substantially complied with state pleading requirements, noting that the pleadings were never captioned in the name of the state, Plaintiffs never filed in the form of a petition, and the fourth amended complaint lacks verification by

affidavit.  ECF Doc. 64 at 18.  Cleveland further argues that Plaintiffs have had multiple

opportunities to seek leave to fix the pleading deficiency, specifically in light of Cleveland

raising the issue in its answer to the fourth amended complaint.  *Id.* at 18-19.

Plaintiffs have moved to amend the complaint, pursuant to Fed. R. Civ. P. 15, to fix the

pleading deficiencies under Ohio Rev. Code § 2731.04.  ECF Doc. 57.  Cleveland filed an

opposition to the motion to amend, arguing that the court should deny the request because:

(i) Plaintiffs did not attach an amended complaint to their motion to amend; (ii) Plaintiffs did not

seek leave to amend the complaint within 21 days of Cleveland raising the § 2731.04

deficiencies in its September 20, 2022 answer; and (iii) granting leave to amend would cause

prejudice to Cleveland.  ECF Doc. 60.  Plaintiffs' reply in support argues that Rule 15(b) favors a

policy of liberally allowing pleading amendments, and Cleveland has not demonstrated that it

would suffer prejudice if the caption of the pleadings were amended – an issue that does not

affect the merits or facts of Count Two.  ECF Doc. 62 at 2-3.

### b.    Law & Analysis

In May 2020, this action was initiated in state court.  ECF Doc. 1-2 at 1.  The complaint,

first amended complaint, and second amended complaint, did not assert a takings claim under

Ohio law.  ECF Docs. 1-2, 1-3, 1-4.  The pleading deficiency alleged by Cleveland did not arise

until the filing of the third amended complaint, which asserted a takings claim under the Ohio

Constitution and Ohio Rev. Code Chapter 163 for the first time – nearly two years into the

proceeding.  ECF Doc. 1-5 at 15-16.  The third amended complaint: (i) did not alter the caption

of the complaint to bring the action in the name of the state on the relation of Riveredge – the

sole plaintiff at the time; (ii) was styled as a complaint instead of a petition and was titled "Third

Amended Complaint for Mandamus, Injunctive Relief & Damages"; and (iii) requested that the

state issue a writ of mandamus compelling Cleveland to initiate appropriation proceedings pursuant to Ohio Rev. Code Chapter 163.  *Id.* at 1, 17.

"Ohio does not have an inverse condemnation or other direct, statutory cause of action for plaintiffs seeking just compensation for a taking."  *Coles v. Granville*, 448 F.3d 853, 861 (6th Cir. 2006); *see also Vary*, 206 F. Supp. 3d at 1276 ("Ohio does not have an inverse condemnation statute.").  Instead, Ohio law requires a property owner who alleges that a taking has occurred to seek of writ of mandamus against the relevant state actor:

> Ohio law provides a statutory mechanism by which the government actor seeking to take property is under a duty to bring an appropriation proceeding against the landowner. A property owner who believes that his property has been taken in the absence of such an appropriation proceeding may initiate a mandamus action in Ohio court to force the government actor into the correct appropriation proceeding.

*Coles*, 448 F.3d at 861 (internal citations omitted).

The third amended complaint's claim for an unconstitutional taking under Ohio law and request for mandamus relief did not comply with Ohio Rev. Code § 2731.04.  However, this was a non-jurisdictional error that did not necessitate dismissal at that time.  Under Ohio Rev. Code § 2731.04, an action for a writ of mandamus "must be by petition, in the name of the state on the relation of the person applying, and verified by affidavit."  The Ohio Supreme Court has held that the requirements of § 2731.04 – a petition brought in the name of the state and verification by affidavit – are not jurisdictional.  *Salemi v. Cleveland Metroparks*, 145 Ohio St.3d 408, 2016-Ohio-1192, 49 N.E.3d 1296, ¶ 15 (Ohio 2016) (collecting cases).  "Further, the failure to verify the petition by affidavit at the time of filing as provided in R.C. 2731.04 has been 'displaced by Civ.R. 11."  *State v. Collica*, 2023-Ohio-2033, ¶ 3 (Ohio Ct. App. 2023) (quoting *State ex rel. Madison v. Cotner*, 66 Ohio St.2d 448, 450, 423 N.E.2d 72 (1981)).

After the third amended complaint was filed, Cleveland did not raise any objection to the form of the pleadings but instead removed the case to federal court nearly two months later. ECF Docs. 1, 1-5.  In this court, Plaintiffs filed the fourth amended complaint, which again did not comply with Ohio Rev. Code § 2731.04.  ECF Doc. 14.  In its answer to the fourth amended complaint, Cleveland raised the failure to comply with Ohio Rev. Code § 2731.04 for the first time, stating: "To the extent that Plaintiffs' seek relief in mandamus, Plaintiffs' Complaint/Petition fails to comply with R.C. 2731.04 et seq., and it must be dismissed."  ECF Doc. 18 at 6.  Cleveland did not file a motion to dismiss Count Two based on this deficiency but eventually raised the issue again in the motion for summary judgment currently before this court. ECF Doc. 49 at 33-34.  This time, Cleveland specifically stated why the pleadings were deficient under § 2731.04, identifying that Plaintiffs failed to bring a petition in the name of the state.  *Id.* at 34.  After Cleveland filed its motion for summary judgment, Plaintiffs moved to amend the caption of the complaint to bring the pleadings in compliance with § 2731.04.  ECF Doc. 57.

Although Ohio courts will dismiss a case for failure to comply with Ohio Rev. Code § 2731.04, the Ohio Supreme Court has recognized that it will grant leave to amend "when a failure to comply with R.C. 2731.04 is raised and the relator files a motion for leave to amend the caption of the complaint to specify that the mandamus action is brought in the name of the state on their relation[.]"  *Blankenship v. Blackwell*, 817 N.E.2d 382, 389 (Ohio 2004).  "If, however, a respondent in a mandamus action raises this R.C. 2731.04 defect and relators fail to seek leave to amend their complaint to comply with R.C. 2731.04, the mandamus action must be dismissed."  *Id.* (denying a writ of mandamus when the respondent raised the § 2731.04 issue in his dismissal motion and merits brief, and the relator failed to respond with a motion for leave to amend the case caption).

Under Rule 15(a), leave to amend should freely be given "when justice so requires." Fed. R. Civ. P. 15(a).  In addressing a request for leave to amend, courts should consider several factors: (1) undue delay in filing; (2) lack of notice to the opposing party; (3) bad faith on the part of the movant; (4) repeated failure to cure deficiencies by previous amendments; (5) undue prejudice to the non-movant; and (6) futility of amendment.  *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458 (6th Cir. 2001).  "This Court has explained that Federal Rule of Civil Procedure 15 is intended to reinforce the principle that cases should be decided on their merits and not merely upon the technicalities of the pleadings."  *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003).  The Ohio Supreme Court has espoused a similar principle for resolving cases on the merits in lieu of dismissing a case for pleading deficiencies.  *See, e.g.*, *Blankenship*, 817 N.E.2d at 389 ("[W]e have granted leave to amend so as to resolve cases on the merits rather than on a pleading deficiency."); *Salemi*, 49 N.E. 3d at 1300-01 (considering the merits of an appeal despite a failure to comply with § 2731.04); *see also State ex rel. Cosmos Broad. Corp. v. Brown*, 14 Ohio App. 3d 376, 378-79, 471 N.E.2d 874, 879 (1984) ("Inasmuch as the Civil Rules apply to mandamus actions, and Civ. R. 8, 10 and 15 allow for liberal construction and amendment of the pleadings, it would appear that technical rules of form should not ordinarily obstruct a merit determination of the substantive issues.").

Here, the court will GRANT Plaintiff's motion to amend (ECF Doc. 57) and DENY Cleveland's request for summary judgment as to Count Two.  Plaintiffs have moved to amend the pleadings to comply with Ohio Rev. Code § 2731.04 in response to Cleveland's motion for summary judgment.  Thus, Count Two should not be dismissed for a failure to comply with Ohio Rev. Code § 2731.04, and Plaintiffs should be allowed to bring their pleadings into compliance.  *See Blankenship*, 817 N.E.2d at 389; *Collica*, 2023-Ohio-2033, ¶ 3(declining to dismiss a case

when the relator failed to caption the case in the name of the state and failed to verify the petition

by an affidavit).  Doing so would allow Count Two to be decided on the merits and not on a

procedural error.  Moreover, the court finds that the interests of justice warrant granting Plaintiffs

leave to amend their complaint.  Cleveland has not demonstrated that it will suffer any prejudice

from allowing amendment to fix the pleading deficiencies.  As discussed above, Ohio courts

prefer to adjudicate a takings claim on the merits and will grant a motion to amend to bring a

case in compliance with § 2731.04 when plaintiff make such a request in response to a motion to

dismiss on those grounds.  And allowing amendment of the complaint does not alter the

substance and merits of the underlying takings claim under Count Two.

Although Cleveland initially raised the § 2731.04 deficiency in its answer to the fourth

amended complaint, the court finds no undue delay because Plaintiffs sought leave to amend

after Cleveland sought dismissal on that grounds of the pleading deficiency and explicitly stated

how the pleadings were deficient.  *Wade*, 259 F.2d at 458; ECF Doc. 18 at 6; ECF Doc. 49 at

33-34; ECF Doc. 57.  There is no indication of bad faith on the part of Plaintiffs, there was no

repeated failure to cure the deficiency – as this is the first attempt to amend after the issue was

raised, and amendment would not futile.  *Wade*, 259 F.2d at 458.  Considering the relevant

factors and the interests of justice, and in light of the principle of Ohio and federal courts to

avoid dismissal on pleading technicalities, the court finds it best to allow amendment of the

complaint.[19]

---

[19] Any issue regarding the fourth amended complaint lacking verification by affidavit has been waived by
Cleveland.  Ohio Rev. Code § 2731.04's requirement that a mandamus petition be verified by affidavit is
not jurisdictional, *Salemi*, 145 Ohio St. 3d at 1300-01, and Cleveland waived this non-jurisdictional
requirement by failing to address it in its initial motion for summary judgment – only briefly mentioning
the requirement for the first time in its reply brief, ECF Doc. 49 at 33-34; ECF Doc. 64 at 18.  *See
Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (recognizing that issues raised for the
first time in reply briefs are waived).  Regardless, Ohio courts have recognized that the verification
requirement has been displaced by Ohio Civ. R. 11 (which provides that pleadings should be signed by

### 3.   Abstention

After determining that it has jurisdiction to issue a writ of mandamus and that dismissal for pleading deficiencies is inappropriate, the court is left with a question as to whether it should abstain from hearing a takings claim under the Ohio Constitution.

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-818 (1976).  However, abstention is a "limited exception" to this obligation.  *MacDonald v. Village of Northport, Mich.*, 164 F.3d 964, 968 (6th Cir. 1999); *see also Hanna v. Toner*, 630 F.3d 442, 445 (6th Cir. 1980) ("Abstention from the exercise of federal jurisdiction is the exception, not the rule." (citation omitted)).

One such exception is *Pullman* abstention, which the Sixth Circuit has held requires: (i) an unclear state law; and (ii) the likelihood that a clarification of the state law would obviate the necessity of deciding the federal claim question.  *Tyler v. Collins*, 709 F.2d 1106, 1108 (6th Cir. 1983).  In *Hall v. Meisner*, the Sixth Circuit directed the district court to abstain from adjudicating an inverse condemnation claim under state law, citing *Pullman*, because "[w]hether the facts alleged here violate the Michigan Constitution's Takings Clause is an issue for the Michigan courts to decide."  51 F.4th 185, 196 (6th Cir. 2022).  This approach was subsequently adopted by the Sixth Circuit in *Sinclair v. Meisner*, 2022 U.S. App. LEXIS 35922, 2022 WL 18034473, at *3 (6th Cir. Dec. 29, 2022) (applying the same approach adopted in *Hall*), and by district courts within the Sixth Circuit as well.  *See, e.g.*, *Flummerfelt v. City of Taylor*, No. 22-10067, 2023 U.S. Dist. LEXIS 126963, at *11 (E.D. Mich. July 21, 2023) ("The court will,

---

attorneys of record), *Collica*, 2023-Ohio-2033, ¶ 3, and Plaintiffs have sought to bring their pleadings into compliance with the requirements of § 2731.04, ECF Doc. 57.  As such, when Plaintiffs file their amended complaint, they should also provide verification by affidavit.

therefore, modify the R&R in this regard, follow the dictates of the Sixth Circuit's decisions in *Hall* and *Sinclair*, and abstain from any and all decisions on the merits of the state law takings claim.").

Although *Hall* involved a takings claim under Michigan law, the court sees no reason why the approach adopted by the *Hall* court would not apply with equal force to a takings claim under Ohio law.[20]  Furthermore, the court could not find a single instance when a district court in the Sixth Circuit has actually exercised jurisdiction over a state law takings claim under the Ohio Constitution and rendered a decision on the merits.  Accordingly, the court will apply the precedent under *Hall* and abstain from considering the merits of the state law takings claims under Count Two.

The court finds that abstention might also be proper under the principle of *Thibodaux*[21] abstention.  In *Vary*, the district court determined that it should abstain from hearing a takings claim under Ohio law pursuant to the doctrine of *Thibodaux* abstention.[22]  *See generally* 206 F. Supp. 3d 1273.  The *Vary* court provided the following extensive analysis:

> In both *Thibodaux* and *Mashuda*, the Supreme Court addressed whether eminent domain raised unique justifications for abstention.  In *Thibodaux*, the Supreme Court highlighted that the eminent domain proceedings were "special and peculiar" in nature compared to most suits at common law.  In particular, the Court highlighted how interpreting Louisiana's law would "apportion governmental powers between City and State."  As a result, the case was "intimately involved with the sovereign prerogative," militating in favor of abstention.

---

[20] Both the Ohio Constitution and Michigan Constitution provide that private property shall not be taken for public use without just compensation.  *Compare* Mich. Const. Art. X, § 2, *with* Ohio Const. Art. 1,§ 19.  Moreover, abstention appears more appropriate in the instance of an Ohio takings claim given that it involves the issuance of a writ of mandamus compelling state action.
[21] *La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959).
[22] *Vary* involved similar facts to the instant case.  The plaintiff alleged that Cleveland caused flooding damage to her property which led to its condemnation.  206 F. Supp 3d at 1275.  Plaintiff brought a diversity action in the Northern District of Ohio and asserted a takings claim under the Ohio Constitution.  *Id.*

However, the *Mashuda* Court further refined this conclusion, holding that the more standard eminent domain issue in that case was no more "mystically involved with the 'sovereign prerogative'" than other types of suits.  The mere fact of adjudicating an eminent domain dispute would not "unsettl[e] some delicate balance in the area of federal-state relations."

Under *Thibodaux* and *Mashuda*, a federal court should abstain in diversity cases if there are (a) uncertain questions of state law and (b) an important state interest that is intimately involved with the government's sovereign prerogative beyond the mere fact of invoking eminent domain law.

ii. Application

Unlike the Louisiana statute in *Thibodaux*, Ohio courts have previously interpreted Ohio law on the issuance of a writ of mandamus for an involuntary taking.  But unlike the law in *Mashuda*, issuing a writ in this case is not a straightforward question of fact.

This Court would have to address questions of law in determining whether to issue the writ.  For instance, to be entitled to a writ of mandamus, Plaintiff must demonstrate that she lacks "an adequate remedy in the ordinary course of law." Ohio courts have wrestled with the question of whether other remedies — such as Plaintiff's other causes of action for trespass and nuisance — provide an adequate remedy as a matter of law.

Moreover, this Court may also have to address mixed questions of fact and law. Plaintiff "must establish a clear legal right to compel the respondents to commence an appropriation action."  But "not every 'invasion' of private property resulting from government activity amounts to an appropriation."  The taking must be a "direct, natural, or probable result of an authorized activity," and the invasion must "appropriate a benefit to the government at the expense of the property owner." Applying this test to Plaintiff Vary's claim is far more complex than the straightforward assessment in *Mashuda*.  Indeed, the complexity invokes Thibodaux's admonition that "[i]nformed local courts may find meaning not discernible to the outsider."

Most importantly, issuing a writ in the name of the State of Ohio that orders a municipal actor to institute state proceedings is intimately involved with the state's sovereign prerogative.  Much like the interpretation of Louisiana's law, Plaintiff is asking a federal court to "apportion[] governmental powers between City and State."

Plaintiff's claim is not seeking a standard form of relief from a federal court sitting in diversity.  Instead, Plaintiff seeks an "extraordinary remedy" to be issued by a federal court in the name of the State.  That order would demand that another Ohio political subdivision commence a state court proceeding. Abstention is proper.

*Id.* at 1278-79 (internal footnotes and citations omitted) (alteration in original).

The reasoning and approach of the *Vary* decision was later adopted by a district court in the Southern District of Ohio.  *See Cal. Pac. Hosp.*, .2019 U.S. Dist. LEXIS 47639, at *8-9.  The court notes that *Vary* involved a case brought on the basis of diversity jurisdiction and *Thibodaux* abstention has been recognized as only applying to cases brought on the basis of diversity jurisdiction.  *See Zoom Elec., Inc. v. IBEW*, 989 F. Supp. 2d 912, 924-25 (N.D. Cal. 2013) ("*Thibodaux* abstention is inapplicable in this case, in which federal jurisdiction is not based on diversity of citizenship." (citing Chemerinsky, Federal Jurisdiction § 12.2 (2007); Moore's Federal Practice 3d § 122.03)).  But there is no authority explicitly stating that *Thibodaux* abstention could not equally apply in cases in which a federal court has supplemental jurisdiction over a state law claim.  Moreover, the concerns and analysis in *Vary* concerning issues of comity and matters intimately involving the state's sovereign prerogative apply no less to the circumstances presented in this case.  As such, *Thibodaux* abstention is either properly applied in this instance or, at least, provides further support for applying *Pullman* abstention.

The court must now determine whether it is appropriate to simply abstain or immediately remand Count Two to state court.  In the context of supplemental jurisdiction and abstention, a district court has the discretion to remand specific portions of an action while retaining jurisdiction over others.  *Morgan v. Rohr, Inc.*, No. 20-cv-574-GPC-AHG, 2023 U.S. Dist. LEXIS 204868, at *14-17 (S.D. Cal. Nov. 15, 2023) (collecting cases).  In similar circumstances, district courts that have declined to exercise supplemental jurisdiction or abstained from hearing state law takings claims, have partially remanded the state law claims, and stayed further proceedings in the federal court.  *See, e.g.*, *Anderson v. Charter Twp. of Ypsilanti*, 71 F. Supp. 2d 730, 732 (E.D. Mich. 1999); *Moeller v. Samsung Elecs. Am., Inc.*, No. 3:22-CV-00013-SHL-

60

HCA, 2022 U.S. Dist. LEXIS 237271, at *15-16 (S.D. Iowa Dec. 7, 2022); *Karma Ventures, LLC v. Chelan Cnty.*, No. 2:20-CV-0446-TOR, 2021 U.S. Dist. LEXIS 26613, at *12-13 (E.D. Wash. Feb. 11, 2021); *United for Mo. v. St. Charles Cnty.*, No. 4:17-CV-2405 CAS, 2017 U.S. Dist. LEXIS 199565, 2017 WL 6026002, at *1 (E.D. Mo. Dec. 5, 2017).

Because the court is declining to exercise supplemental jurisdiction over Count Two pursuant to the doctrine of *Pullman* abstention, the court will partially remand the state law takings claim under Count Two to the Cuyahoga County Court of Common Pleas.  The court shall retain jurisdiction over the federal takings claims under Count One and stay proceedings pending adjudication of the state law claim.

## VIII.  Conclusion

Accordingly, for the foregoing reasons,

(i)     Defendant's objection/motion to strike (ECF Doc. 56) is DENIED IN PART and GRANTED IN PART;

(ii)    Plaintiffs' motion to amend (ECF Doc. 57) is GRANTED.  Plaintiffs are instructed to file an amended complaint that brings the pleadings into compliance with the requirements of Ohio Rev. Code § 2731.04 **within 7 days (by February 22, 2024)**;

(iii)   Plaintiffs' motion for summary judgment (ECF Doc. 40) is DENIED;

(iv)    Cleveland's motion for summary judgment (ECF Doc. 49) is GRANTED IN PART, and DENIED in PART, as follows:

a.   Count One is DISMISSED as to plaintiffs West Valley, Shah Trust, Dr. Kim, KP, LLC, and RDI;[23]

b.   Count Two is DISMISSED as to plaintiff RDI;[24]

c.   Count Three is DISMISSED as to all plaintiffs;

---

[23] Count One remains pending as to Riveredge's federal takings claim.
[24] Count Two remains pending as to the state takings claims asserted by Riveredge, West Valley, Shah Trust, Dr. Kim, and KP, LLC.

61

(v)     Count Two is REMANDED to the Cuyahoga County Court of Common
        Pleas; and

(vi)    The remainder of proceedings are STAYED and administratively closed
        pending adjudication of Count Two in state court.

**IT IS SO ORDERED.**

Dated: February 15, 2024

Thomas M. Parker
United States Magistrate Judge